## A. GUTHRIE & CO., Inc., v. STANDARD MARINE INS. CO., Limited.

## CHESLEY TUG & BARGE CO. v. SAME.

Circuit Court of Appeals, Ninth Circuit.
March 18, 1929.

No. 5638.

William H. Gorham, of Seattle, Wash., for appellants.

Cosgrove & Terhune, of Seattle, Wash., for appellee.

Before RUDKIN and DIETRICH, Circuit Judges, and BEAN, District Judge.

DIETRICH, Circuit Judge. In the court below two libels were consolidated for trial,

and the decrees dismissing them are brought here for review upon a single record. Each is upon a certificate of marine insurance issued by appellee on February 2, 1926, and covering, in the one case a locomotive crane (upon its own wheels) in the possession of but not owned by the city of Tacoma, assignor of libelant Chesley Tug & Barge Company, and in the other certain camp equipment belonging to libelant A. Guthrie & Co., loaded upon railroad cars, and all on board car barge Chesley No. 1 in Hood Canal at Potlatch, Wash., bound for Seattle in tow of tug Ketchikan II. In each case the insurance was against perils of the sea. With the tow, the tug, in charge of a crew consisting of master, mate, and cook, left Potlatch about 6 o'clock in the morning on February 2d. In substance the master testified that they had good weather at least up to midnight of that day, at which time he was in the Sound about half a mile northeast of Apple Cove Point. He went below at 12:15 a. m., and, getting up again at 2 o'clock, he found the wind had risen, the "sea was picking up," and the tug was beginning to rock. He remained on deck about an hour when, the wind having begun to subside, he again went below. There was at that time a "rolling swell" and the tow was riding "normally the same as when I left the canal." Being roused between 3:30 and 4 o'clock by a change in the operation of the tug's engine, he went on deck, where he learned that the barge had spilled her load. The lights were out, and "it seemed like the scow (barge) was standing on end."

In each case appellee joined issue upon appellant's contention that the loss was caused by "tempestuous weather, wind, and waves," and alleged affirmatively that on leaving Potlatch the barge was unseaworthy, in that, (1) water leaked into her hold in large quantities and was not pumped out at reasonable intervals, (2) she was overloaded, and (3) the crane and cars were improperly stowed and insecurely fastened on the deck.

■ In the view we take it is not necessary to decide whether, under the circumstances shown, the wind and waves were such as to constitute causal perils of the sea within the meaning of the certificate, and we have considered the evidence upon that head only because of its indirect bearing upon the third branch of the affirmative defense. The testimony is conflicting, but upon the whole we think it fails to establish that there was a tempest, or that the wind was extraordinarily high, or that the water was exceptionally rough. The cook failed to testify, and the mate's version did not materially differ from that of the master, the substance of which we have already set forth. Their view of the actual conditions at the time of the loss are perhaps best summed up in the written "protest" they filed the day after the loss, in which they stated, "the tide then flooding and the sea then being smooth with a heavy swell running and a strong southerly wind prevailing," that is, as explained by the master upon cross-examination, it was a "smooth, rolling sea, * * * but there were no white caps when it was blowing."

Turning to the charge of unseaworthiness, admittedly the burden was upon appellee to establish this defense, and as to water in the hold and overloading, the court below was of the opinion that it failed to carry the burden. We find no reason for disturbing these conclusions. Upon the third branch of the defense, however, the court held with appellee, and upon that ground dismissed the bills.

■ The barge was 90 feet long and about 37 feet wide. Over the deck proper was a sheathing consisting of planks about 3½ inches thick laid athwartships. Upon this sheathing were three railroad tracks, the rails being fastened down with ordinary railroad spikes. On the center track were placed the crane, on its own wheels, and forward of it an empty gondola car over which was suspended the boom of the crane. On each of the other tracks were two railroad cars loaded with the camp equipment. There was testimony tending to show that when the cars were taken on during the afternoon of February 1st the air brakes were set and also the hand brakes. The crane, though of greater weight than the cars, had no air brake and only a small hand brake effective to hold on a grade of possibly 3 per cent. There were cross-timbers or head-logs at each end of the barge to keep the cars from running off. Between the head-log at either end of each track and the adjacent wheels thereon, blocking was placed consisting of timbers similar to ordinary railroad ties. These timbers were not fastened together, nor were they attached to the rails, deck, or head-logs. There were no shores, jacks, or other devices set under the corners of the cars to take the shifting weight due to the rolling of the barge. The crane was shorter than the railroad cars, and because of its great weight it was put forward as far as possible, leaving an unusually large space for blocking between its rear wheels and the rear head-log.

When so loaded at Potlatch, the barge was down a foot by the stern with a four-inch list to starboard. No one saw the accident, but

a subsequent inspection disclosed that some of the rails had been entirely dislodged and, from the marks of the wheels upon the sheathing, it appears that the cars had spilled into the sea from what was thus the lowest point on the deck. And the physical evidence leaves no doubt that the lateral force by which the rails were torn loose from the decking was exerted from port to starboard. It further appears from the photographs that the railroad spikes were at irregular intervals, some of which were much greater than are ordinarily to be observed in standard railroad construction. The spikes were of the usual length, but because of the thickness of the sheathing they penetrated the decking proper but a very short distance. Not only do the photographs tend to show that the sheathing was measurably infirm from use and exposure to the weather, but the testimony leaves no doubt that at places it was in an advanced stage of decay. On cross-examination a witness for the appellants testified:

"Q. What was the condition of the deck as far as being sound or decayed? A. There was depreciation. I would not say terribly rotten.

"Q. It was some rotten, though? A. Yes."

Being defective in this respect, the barge itself was not staunch or strong, and considering the manner in which the cars left the deck, it is difficult to escape the conclusion that the defect was one of the proximate causes of the loss. Had the cars been shored up or jacks placed under the corners, as some of the testimony tends to show is standard practice, the lateral strain on the rails would have been alleviated, and the defective condition of the decking possibly rendered inconsequential.

In an effort to visualize what occurred, the court below said: "The list being to starboard, the greater strain was on the starboard rail of each track, and, as was to be expected, more of the starboard rail of the starboard and center tracks was loosened than of the port rails. Only one rail, the starboard rail, of the port track was loosened, its port rail being the only one on the barge which appears to have been left intact. Evidently the blocking at the rear of the crane worked out of place, or was washed away; the brake on the crane did not hold it, and that on the empty gondola was not sufficient to hold both that car and the crane, and there would be slack in the drawhead between the two. They worked aft, putting the barge down still more by the stern. The crane pounded on the head-log. From conditions as disclosed by the photographs, it would appear not unlikely that the rear car on the port track may also have done this. Evidently the rear head-log was carried away, the cars on the port track went over the stern. After leaving the center track the crane had been working down to starboard when, with the loss of the cars on the port track the weight was gone from the port side of the barge, the crane and other cars were spilled over the starboard side. The crane probably was kept from going over the stern by reason of the low hung bumper at the rear of the crane bringing up against some part of the barge. After the crane left the rails the wheels evidently did considerable damage to the after deck before the load was spilled. These wheels may have worked into the deck sufficiently to have brought this bumper in contact with the 4 by 16 under the after head-log."

Considering the physical conditions as disclosed by the photographs, together with the testimony, we cannot see that this view is without basis of fair inference or extends into the realm of speculation. Upon the whole we agree with the court that the barge was unseaworthy at the commencement of the voyage and that her condition in that respect was the proximate cause of the loss. For this conclusion a favorable background, at least, is afforded by the fact that the barge encountered no extraordinary stress of wind and wave, or other emergency.

The decrees are therefore affirmed.