No. 42,489

THE HOME INSURANCE COMPANY, INC., *Appellee*, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a Corporation, *Appellant*.

(369 P. 2d 838)

Opinion filed March 3, 1962.

*Charles W. Harris*, of Wichita, argued the cause, and *C. J. Putt, W. E. Treadway, J. B. Reeves* and *William A. Walton*, all of Topeka, and *Lawrence Weigand*, of Wichita, were with him on the brief for the appellant.

*Harry L. Hobson*, of Wichita, argued the cause, and *Emmet A. Blaes, Roetzel Jochems, Robert G. Braden, J. Francis Hesse, James W. Sargent, Stanley E. Wisdom, Cecil E. Merkel, Bruce W. Zuercher, Terrance J. Muth* and *Lawrence D. Klenda*, all of Wichita, were with him on the brief for the appellee.

The opinion of the court was delivered by

PRICE, J.: Twelve head of cattle were killed when struck by a Santa Fe passenger train. The owners thereof were paid the value of the cattle by their insurance company. The insurance company, under its subrogation rights, later brought suit against the Santa Fe to recover the amount so paid—charging negligence.

A jury found for plaintiff insurance company. Defendant railroad's post-trial motions were overruled and judgment was entered upon the verdict. The railroad has appealed.

Highly summarized—the facts giving rise to this lawsuit are as follow:

On the evening of January 26, 1958, Bernard P. Martin was hauling a load of seventeen cattle from Emporia to the stockyards at St. Joseph, Missouri. The cattle were owned by his father and brother. At about eight o'clock, while the truck was near the south city limits of Topeka on U. S. Highway 75, one Crosby drove his car in front of the truck in such a manner that Bernard was forced to "swerve" in order to avoid a collision. This caused the cattle to

shift, and the trailer overturned off the road permitting them to escape. Topeka police and sheriff's officers gathered at the scene. It was dark, the weather was cold and the ground covered with snow. Bernard and the officers were able to locate some of the cattle but were unable to round them up and get them back in the truck by reason of the circumstances and the excited condition of the cattle.

Shortly thereafter the yardmaster of the Santa Fe was notified of the fact that some of the cattle were on its main line tracks and it was suggested that trains moving thereon exercise extreme caution. Accordingly, a "slow order" was put into effect by the Santa Fe. One of its special agents, Joe Brennan, arrived at the scene and was fully aware of the situation with respect to the cattle running loose. The bulk of them had moved east from the highway toward the railroad tracks. Eight head were finally quieted down along 29th Street, west of the tracks, in a sort of fenced-in enclosure, which, however, was not secure in that a small portion of the fence had been knocked down as the result of some previous incident not connected with the matter here involved. In the meantime Bernard's brother, Paul Martin, had arrived on the scene from Emporia, and both of them were aware of the fact that eight head were in the enclosure above mentioned, and that four head were at another location which was thought to be secure. They returned the short distance to the highway to watch over a steer which had a broken leg so as to keep it off of the traveled portion of the highway. During all of this time police and sheriff's officers were at the scene lending what assistance they could under the extremely adverse conditions and circumstances. Finally, it appearing that nothing further could be done, they left.

At about 10:30 p. m. the railroad was again advised by the police dispatcher that the cattle were not then on the right-of-way but that they were in the vicinity of it and could return to it, and that the "slow order" should be continued until further notice from police headquarters. The railroad yardmaster replied that such would be done "until he heard from the authorities." Later that night the twelve head of cattle in question wandered onto the railroad right-of-way and were struck by a passenger train traveling at a speed of approximately sixty miles per hour. All twelve were killed. The "slow order" had not been lifted or rescinded.

By virtue of its insurance policy covering the Martins plaintiff in-

surance company paid to them the sum of $4,077.14 for the loss of the twelve head of cattle. Plaintiff thereafter settled its claim against Crosby for the sum of $1,000, reserving its right to proceed against the railroad. Suit was thereafter brought to recover the sum of $3,077.14. The jury returned a general verdict for plaintiff in that amount and made special findings as follow:

"1. Did the owners of the cattle exercise due care for the protection of their cattle after they had been located by the law enforcement officers? ANSWER: Yes.

"2. Were the owners of the cattle guilty of any negligence which contributed to their having been struck by the train? ANSWER: No.

"3. If your answer to the foregoing question is in the affirmative, of what did their negligence consist?

"4. Was the defendant railway company guilty of any negligence which caused the cattle to be struck by the train? ANSWER: Yes.

"5. If your answer to the foregoing question is in the affirmative, of what did its negligence consist? ANSWER: The railroad company failed to exercise due caution to avoid killing the cattle which they had been advised were in the vicinity and could be on the track."

In its appeal defendant railroad's fourteen specifications of error raise numerous questions concerning the right of plaintiff to maintain the action; the sufficiency of the evidence to support the findings and verdict; rulings on evidence; instructions given and refused; the fact of the cattle "running at large" in violation of law; whether at the time and place in question they were "in transit" within the terms of the insurance policy; the alleged lack of evidence as to the value of the cattle to support the amount of the verdict—and many other matters, which, it is alleged, constituted error.

A careful examination of the record, however, convinces us that the contentions present no new questions or points of law in this jurisdiction, and that to undertake to set out and discuss in detail each of the arguments would serve no purpose other than to lengthen this opinion unnecessarily. In fact, we believe that the statements appearing at page 138 in *Domann v. Pence*, 183 Kan. 135, 325 P. 2d 321, have application to the matters here presented.

The underlying basic question in this case is whether, under the facts and circumstances disclosed, plaintiff insurance company's insureds were guilty of contributory negligence in their care—or lack of care, as urged by defendant—of the twelve head of cattle in question, and whether under all of the facts and circumstances defendant railroad was guilty of actionable negligence.

At the conclusion of plaintiff's evidence defendant demurred. In ruling thereon the trial court said:

"The questions concerning negligence that have been raised are for the jury. The demurrer is overruled."

We agree with that ruling.

The special findings make it very clear the jury was of the opinion that under all of the confronting conditions and circumstances the owners of the cattle were not guilty of any negligence which contributed to the fact of the cattle being struck by defendant's train, and also make it equally clear the jury was of the opinion that defendant railroad was guilty of actionable negligence in failing to keep in effect the "slow order" until notified otherwise by the authorities.

In connection with the last-mentioned matter we quote portions of the running account of the events of the evening contained in a report made by the dispatcher on duty at the Topeka Police Department:

"Car 40 asked for me to public service the Santa Fe and advise them that the cattle were on the main line of Santa Fe tracks and to have all the trains to slow down. I advised car 40 that the Santa Fe had been contacted at 9:21 p. m.

"At 9:26 p. m. Joe Brennen, special agent for the Santa Fe, called this dispatcher to ascertain where the men were that were rounding up the cattle, that he was going out to the scene. I advised car 40 of this at 9:27 p. m.

.    .    .    .    .    .    .    .    .    .    .    .

"During the time from 9:30 p. m. and 10:15 p. m., the cattle went back and forth between 37th and 29th on the main line of the Santa Fe. At approx. 10:25 p. m. they had quieted down and were near 29th and Kansas. I public serviced the Santa Fe and advised the yardmaster of this. Also that the cattle were still near the tracks and could go back up on the main line at any time and suggested that they slow the trains down till further notice. He advised that he would do so."

The findings of the jury are well within and are supported by the evidence.

In conclusion we wish to state that none of defendant's contentions has been overlooked or ignored. Each has been given careful consideration, but all are found to be without substantial merit. The law does not guarantee to every litigant a "perfect" trial. (*State v. Severns*, 184 Kan. 213, 222, 336 P. 2d 447.) It does, however, guarantee to him a *fair* trial—and there is nothing in the record to indicate that such was not had in this case. In *Cook v. Railway and Bridge Co.*, 101 Kan. 103, 165 Pac. 803, it was said:

". . . It is not enough to disturb a judgment that some error or impropriety transpires in a trial. It is necessary that the appellant go further and show that the matter complained of prejudicially affected the net result." (pp. 105, 106.)

In *Cox v. Chase,* 99 Kan. 740, 163 Pac. 184, it was said:

". . . But we are forbidden both by precedent and by statute to reverse causes except for prejudicial error affirmatively appearing when it appears that substantial justice has been done in the case." (p. 748.)

and held:

"In this state error does not raise the presumption of prejudice. Experience has led to the classification of errors into those termed prejudicial and that greater legion denominated harmless. For the former only can reversal be ordered." (syl. 11.)

We find nothing in this case to justify a reversal, and the judgment is therefore affirmed.