No. 46,495

L. V. Thompson, *Appellee*, v. Keith L. Meyers and Fred W. Reust, *Appellants*.

(505 P. 2d 680)

Opinion filed January 20, 1973.

*William E. Enright,* of the firm of Scott, Quinlan & Hecht, of Topeka, argued the cause, and *Robert D. Hecht* and *Jack A. Quinlan,* of the same firm, were with him on the brief for the appellants.

*Arthur Palmer,* of the firm of Goodell, Casey, Briman, Rice & Cogswell, of

Topeka, argued the cause, and *Glenn D. Cogswell*, of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: This is an action to recover money alleged to be due under a written contract. The trial court entered judgment in favor of the plaintiff, L. V. Thompson, and the defendants, Meyers and Reust, have appealed. The parties will be designated either as plaintiffs and defendants, or by name.

The defendants are real estate operators who, in the year 1966, were engaged in promoting a shopping area in Wyandotte County. In furtherance of this design they entered into a contract on May 2, 1966, with the Alta Investment Co. Inc., hereafter called Alta, for the purchase of a 33 acre tract of land at a price of $370,000, payable as follows: $7,000 on the signing of the contract, $8,000 on or before May 9, 1966, $12,775 on or before June 15, 1966, and the balance of $342,225 at the time of closing, which should be no later than August 1, 1966. We may conclude from the record that at this time the defendants were dickering with K-Mart for a lease of a portion of the proposed shopping center and were hoping to close the K-Mart deal prior to August 1, 1966.

Meyers and Reust made the $7,000 down payment but apparently needed financial assistance with respect to subsequent payments, and they turned to Thompson, a Topeka capitalist, for help. On May 9, 1966, the date on which the second payment was due Alta, the defendants signed an agreement with Thompson which has given rise to this lawsuit. Omitting formal parts and the whereases, the contract provides:

"1. Thompson does hereby agree that he will, upon the execution of this agreement, deliver unto the said Meyers and Reust, the sum of Eight Thousand and No/100 ($8,000.00) Dollars, which amount is to be paid to the said Alta Investment Co., Inc. for the purpose of keeping the above said Contract to Sell Real Estate in full force and effect.

"2. Thompson further agrees that he will pay an additional Twelve Thousand and No/100 ($12,000.00) Dollars to the said Meyers and Reust on or before the 15th day of June, 1966 *upon the request of Meyers and Reust.*

"3. As consideration for said payments by Thompson, Meyers and Reust do hereby agree that in the event they, or their *nominee,* purchases said real estate, they will pay to Thompson, a sum equal to the amount of money which Thompson has paid to them under the terms of this agreement, plus the sum of Thirty Thousand and No/100 ($30,000.00) Dollars. Said amount shall be paid on or before three (3) years from the date that Meyers and Reust, or *their nominee,* obtain title to the above said real estate.

"4. In the event Meyers and Reust, in their sole discretion, determine that it would not be advisable to purchase said real estate, then it is agreed that they will repay Thompson a sum equal to one-half of the amount which Thompson pays to them under the terms of this contract. Said amount shall be paid no later than three (3) years from the date that Meyers and Reust notify Thompson that they have determined not to purchase said real estate.

"5. Thompson does hereby expressly acknowledge that in the event said real estate is not purchased by Meyers and Reust *or their nominee,* that he will recover from the said Meyers and Reust only one-half of the amount of money which he has invested in said venture, and that he will release and hold Meyers and Reust harmless from any claims or demands which he may have, or hereinafter acquire by virtue of his loss in one-half of the investment made under the terms of this agreement.

"6. In the event said real estate is purchased by Meyers and Reust, *or their nominee,* Thompson does hereby agree that the said Meyers and Reust, or their nominee, shall have complete control over the sale, disposition or development of said real estate and he hereby disclaims any interest he may have therein by reason of any investment or payments made to the said Meyers and Reust under the terms of this agreement.

"7. This agreement shall be binding upon, and inure to the benefit of all of the parties hereto, their heirs, successors and *assigns.*" (Emphasis supplied.)

Thompson delivered the $8,000 payment to the defendants on May 9, as was agreed upon, but he did not supply the additional $12,000 which was due on the Alta contract on or before June 15, 1966, it being his contention that this amount was never requested of him by the defendants. This is one of the points in dispute and we will refer to it later on.

The record reflects that during the first week of June, 1966, the defendants entered into negotiations with three Texans, Jack Coogan, Roland E. Walters and W. Floyd Clark, all of Houston, to whom we will collectively refer as the Coogan group. The negotiations culminated in the Coogan group making a loan of $12,775 to Meyers and Reust on June 14, and in Meyers and Reust granting the Coogan group an option to purchase their interest in the Alta contract for the sum of $132,775 less the amount of the loan. This transaction is evidenced by a letter from Meyers and Reust to Roland Walters, Trustee, dated June 14, 1966. On July 21, 1966, the option was extended and modified in certain particulars which are of little or no consequence here.

A letter finalizing the details regarding the Coogan group's option was sent by Meyers to Walters under date of September 15, 1966. Pertinent portions of this document will be examined in more detail hereafter.

A warranty deed was duly executed by Alta Investment Co., Inc. on September 19, 1966, conveying the Wyandotte tract to Jack Coogan and Roland E. Walters.

On June 12, 1969, Thompson filed the present lawsuit alleging that under the terms of his contract with Meyers and Reust they became indebted to him in the sum of $38,000; that $15,000 of that amount had been paid; and that $23,000 was still owed him. The action was tried to the court and Thompson was awarded judgment for the full amount of $23,000.

The major thrust of the defendants' arguments on appeal may be divided into four separate parts.

Their first contention is that neither they nor their nominee purchased the shopping center property from Alta, and hence their obligation to Thompson was simply to pay him what the contract provided in case Meyers and Reust decided not to buy the property, namely, one-half of what Thompson had put up, or $4,000. The defendants argue that Coogan and Walters were not nominees of Meyers and Reust within the meaning of their contract with Thompson but were their assignees, and that Coogan and Walters purchased the Wyandotte property from Alta after Meyers and Reust had assigned to them their interest in the Alta contract.

The trial court rejected this contention and held as a matter of law that Coogan and Walters were the nominees of Meyers and Reust in their purchase of the real estate from Alta. The court reasoned that in order for a nominee of Meyers and Reust to purchase the property from Alta, Meyers and Reust would be required to assign their interest in the contract to their nominee, and that this was within the contemplation of the parties who were signatories both to the Alta and to the Thompson contracts.

We agree with the trial court's conclusion on this point. The sense in which the term "nominee" is used in the two contracts is to be ascertained from the intention of the parties as it may be expressed in the instruments as a whole. (See cases in 2 Hatcher's Kansas Digest [Rev. Ed.] Contracts, §§ 39, 42.)

The first paragraph of the contract between Alta and Meyers and Reust reads:

"THIS CONTRACT, made and entered into this 2nd day of May, 1966, by and between ALTA INVESTMENT CO., INC., a Kansas corporation, hereinafter referred to as 'Seller' and KEITH L. MEYERS and FRED W. REUST, or their Nominee, hereinafter referred to as 'Buyer.'"

Thus the defendants' nominee is tied to the contract as a buyer, a buyer designated by Meyers and Reust should they decide not to purchase the property in their own right. We believe it clear that the parties to the Alta contract had in mind that Meyers and Reust could buy the property, themselves, or they could select someone else to do so, and this party they described as a nominee.

It seems equally clear that both Thompson and the defendants contemplated that the nominee selected by defendants could "purchase" the real estate and "obtain title" thereto, for these terms occur with some frequency in the Thompson contract. Moreover, the contract concludes with a proviso that it is binding upon and inures to the benefit of all the parties, their heirs, successors and assigns.

In common parlance the word "nominee" has more than one meaning. Much depends on the frame of reference in which it is used. In Webster's Third New International Dictionary, unabridged, one of the definitions given is "a person named as the recipient in an annuity or grant." We view a "nominee", as the term was used by the parties here, not simply in the sense of a straw man or limited agent for Meyers and Reust, but in the larger sense of a person designated by them to purchase the real estate, who would possess all the rights given a buyer in the Alta contract.

In the eyes of the law we believe the purchase by Coogan and Walters was in practical effect a purchase by Meyers and Reust, themselves, who reaped a profit from the transaction to the tune of $93,000. In the letter of September 15, 1966, to Walters finalizing the details of the deal, Meyers wrote in pertinent part:

"On or before September 19, 1966, you will deliver to us the sum of $323,725.00 . . . we shall close the transaction with Alta Investment Co., Inc., and have title to the real estate put in the name of Jack Coogan, Roland E. Walters and W. Floyd Clark, as tenants in common. You shall also deliver to us a promissory note and first mortgage in the sum of $120,000.00 . . . due and payable on or before January 10, 1967. . . .

". . . [W]e hereby assign unto you all of our right, title and interest in and to the above said contract with Alta Investment Co., Inc. as amended and modified, and you agree to assume all of the obligations and agreements on our part to be performed thereunder."

It appears that the defendants were in full control of the closing procedure with Alta and the designation of the grantee.

In *Schuh Trading Co. v. Commissioner of Internal Revenue*, 95

F. 2d 404, 411, the federal court, in discussing the significance of the word "nominee", said:

". . . It is used sometimes to signify an agent or trustee. It has no connotation, however, other than that of acting for another, in representation of another, *or as the grantee of another.* . . ." (Emphasis supplied.)

For this court to hold that the defendants could evade their responsibility to Thompson under their contract, on the pretext that Coogan and Walters were not their nominees, would be to engage in sophistry and open the door to sharp dealing. Such is not the purpose, or the role, of the law.

It is next argued that Thompson breached his agreement to supply the $12,000 needed to make the June 15th payment due on the Alta contract. There is a good deal of testimony as to what transpired the early part of June 1966, not only between the defendants and Thompson but also between the defendants and the Coogan group. Meyers and Reust contend they were unable to contact Thompson during the first few days in June and were compelled to protect their interests by concluding an agreement with the Coogan group on June 6, 1966, under which the Coogan group agreed to, and did, supply the money needed to meet the June 15th payment. Thompson's testimony, as might be expected, was quite the contrary so far as his availability and readiness to put up the $12,000 was concerned.

No good purpose would be served by summarizing the lengthy and conflicting testimony introduced on this point at the trial. The trial court found that the defendants never made any request of Thompson for payment of $12,000; that during one conversation Meyers told Thompson it did not look as if it would be necessary for him to advance any more money; that Thompson, nonetheless, borrowed $12,000 from the bank to meet the June 15th payment to Alta if the same were needed; that Thompson was in Topeka from June 1 until June 6, but was not contacted by the defendants; and that he left word where he could be reached, if necessary, while on a projected fishing excursion. The trial court concluded that Thompson had not broken his agreement with Meyers and Reust.

On this branch of the appeal, we need only say that the findings of the trial court are adequately supported by substantial competent evidence. Thus our trusty time honored rule must be given effect. This court, on appeal, does not weigh conflicting evidence and will not disturb findings of the trial court which are shown to be sus-

tained by substantial competent evidence. (See cases cited in 1 Hatcher's Kansas Digest [Rev. Ed.] Appeal & Error, §§ 507, 508.)

As another defense to Thompson's claim the defendants have pleaded an accord and satisfaction. They maintain that an agreement was reached between Thompson and themselves in which Thompson was to receive $20,000 in full settlement of the amount due under his contract, and that $15,000 of this amount had already been paid, while the other $5,000 was due on demand—but that no demand had ever been made. The plaintiff, of course, takes an opposite view, while conceding that he had received $15,000.

Accord and satisfaction is an affirmative defense and, as such, it must be pleaded. (K. S. A. 60-208 [c].) To be effective both the accord, and the satisfaction, must be established. (*Block v. Bodam*, 128 Kan. 354, 278 Pac. 19; *Manning v. Woods, Inc.*, 182 Kan. 640, 643, 324 P. 2d 136.) A general definition of the terms is found in *Lighthouse for the Blind v. Miller*, 149 Kan. 165, 86 P. 2d 508:

"An accord is a contract between creditor and debtor for the settlement of the claim by some performance other than that which is due. Satisfaction takes place when the accord is performed." (Syl. ¶ 1.)

A series of dialogues undoubtedly took place between Thompson and the defendants concerning what Thompson was due, and the amount for which Thompson would settle his claim. This jockeying started on the evening of June 6, 1966, when, seemingly by pure chance, Thompson and his wife ran into—or were run into by—Meyers and Reust who were celebrating, with members of the Coogan group, their newly completed agreement for Coogan to furnish the $12,000. The encounter took place in the Cloud Room of the Kansas City Hilton, where Thompson was asked for the first time what he would take to settle. Thompson replied, in effect, this was neither the time nor the place for such mundane chatter. Periodically thereafter conversations were had between Thompson and the defendants, various sums were talked about, and various methods of payment were discussed.

The trial court found:

"Commencing with the meeting of the parties on June 6, 1966, and at various times thereafter, there were repeated discussions between the plaintiff and defendants. The defendants took the position that they should not pay the plaintiff all that they agreed to under their contract and insisted that they were not indebted to him in the full amount. Plaintiff wanted his money under the contract and although he apparently would have been willing to compromise on payment of cash forthwith, there never was an actual meeting of the minds

or agreement between the parties which would constitute an accord or satisfaction or an agreement by the defendants to pay and the plaintiff to accept any sum less than that originally provided for under the contract."

Our review of the evidence in its entirety leads us to conclude that this finding must be sustained. Although the parties came close to concluding a settlement on the basis of $20,000, there is evidence from which it can be inferred they could not agree on how, or when, or in what manner the final $5,000 was to be paid.

Finally, the defendants contend in their brief that on the basis of the plaintiff's own theory this action was brought prematurely. The record shows that Thompson filed his petition June 12, 1969. The defendants point out that Alta's deed to Coogan and Walters was executed September 19, 1966, and that payment to Thompson would not become due under the terms of his contract, until three years thereafter, that is, until September 19, 1969.

This point, the plaintiff contends, was not raised in the trial court, and plaintiff would have us invoke the familiar rule that matters not presented to the trial court will not be considered for the first time on appeal. (*Evangelist v. Bellern Research Corporation,* 199 Kan. 638, 433 P. 2d 380; *In re Bowlus,* 197 Kan. 351, 416 P. 2d 711.)

There is nothing in the record to indicate that this defense was ever raised in the defendants' pleadings. Neither is mention made thereof in the findings or conclusions of the court, or in the judgment which was entered. Accordingly, it would seem the point is not before us for review.

There is a further basis, however, for rejecting the defendants' argument on this issue. On December 9, 1969, Thompson filed what he entitled his First Amended Petition. The date of this filing, it will be noted, is some two months after Thompson's claim matured. In *Hospital Co. v. Philippi,* 82 Kan. 64, 107 Pac. 530, this court considered the question of premature filing and said:

"Where the devisee of the will brought the action before the will was probated, and later, when it was probated, filed an amended and supplemental petition, on which the cause of action was tried, the objection that the action was prematurely brought became immaterial." (Syl. ¶ 3.)

An analogous principle is stated in 1 C. J. S., Actions, § 127a, p. 1395:

"The error or defect of premature commencement may be cured by filing an amended or supplemental complaint after the cause of action has accrued, unless the amended complaint states a different cause of action."

The defendants cites language from 1 Am. Jur. 2d, Actions, § 87, to

the general effect that a cause of action must exist and be complete before an action can be commenced, and where a proceeding has been started before the cause of action stated in the pleadings has arisen, it will usually be dismissed when proper objection is raised. In the case at hand no objection appears to have been interposed before the district court. Moreover, the rule is tempered by what is said in § 90 of the same text:

". . . [W]here the cause of action has matured before the objection is made that the action was prematurely brought, the plaintiff may, upon payment of costs, proceed with the action by amendment, or, in the discretion of the court, file a supplemental petition. . . ." (p. 620.)

We find no error in the judgment entered in the trial court and the same is affirmed.

PRAGER, J., not participating.