No. 47,924

WILLIAM F. MARTIN, *Appellant,* v. R. M. EDWARDS, *Appellee,* and
SIDNEY A. MARTIN (Defendant).

(548 P. 2d 779)

Opinion filed April 10, 1976.

*Hugh D. Mauch,* of Keenan, Mauch and Keenan, P. A., of Great Bend, argued the cause and was on the brief for the appellant.

*Jerry M. Ward,* of Great Bend, argued the cause, and *Don C. Foss* and *Thomas J. Berscheidt,* both of Great Bend, were with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is an action brought by one allegedly owning a "carried interest" to determine his rights in certain oil and gas leases principally located in Rice and Ellsworth counties and for an accounting of the proceeds of those leases from the lessee. Trial to the court resulted in a judgment for the latter from which plaintiff has appealed. The principal issue is whether plaintiff became a third party beneficiary entitled to enforce a contract between the lessees.

Where discrepancy exists as to the factual background our recitation will be in the aspect most favorable to the defendant as the prevailing party in the trial court.

In 1966 Sidney Martin was a lawyer in Denver, Colorado, specializing in oil and gas law. His clients included persons who had oil interests in Ellsworth county, Kansas. Defendant R. M. Edwards, an investor residing in Tulsa, Oklahoma, was a large stockholder in several companies engaged in the manufacture of heat exchange equipment. One company in which Edwards held controlling interest had in its employ as a sales specialist and administrative assistant plaintiff William Martin, a brother of Sidney Martin. Plaintiff and Edwards had become friends at work and also socially. Plaintiff William had introduced his brother Sidney to defendant Edwards at least as early as August, 1966. As a result of that introduction and their later friendship Edwards and Sidney eventually acquired interests as tenants in common in certain oil and gas leases in Ellsworth county. Following a new oil discovery in the vicinity of those leases Sidney, with Edward's consent, attempted to find open acreage available for lease. They acquired new leases in the area, Sidney evaluating and securing them and Edwards advancing

the necessary funds. Initially all leases were acquired for speculative purposes with development contemplated by third parties.

One of these new leases, the Gemeinhardt, had a relatively short primary term and in order to extend it a test well had to be drilled. Sidney Martin tried unsuccessfully to interest third parties in drilling an exploratory well on the lease. He decided to go to New Orleans in hope of finding investors who would advance the necessary money. En route to that city on September 1, 1967, he stopped at Tulsa and at William Martin's home had an extensive conversation with Edwards concerning their leases. The upshot of the matter was that Edwards then orally agreed to furnish Sidney the funds to develop the Gemeinhardt lease and two others. It was agreed between him and Sidney that upon recovery of Edward's costs he and Sidney would own the leases in equal shares. William Martin then told Edwards that he, William, had brought Edwards and Sidney together and "I am left out". Edwards responded that he would talk to Sidney "and see if he would give Bill Martin part of it". Edwards did tell Sidney he wanted Sidney to "take care of" his brother William out of Sidney's part. Thereafter Sidney prepared a letter dated September 12, 1967, evidencing the oral agreement and both he and Edwards signed it:

The letter stated:

"This is written as a memorandum of our agreement of September 1, 1967, relative to the oil and gas leases in our Southwest Bushton block, Rice County, Kansas, more particularly identified as: [names and legal description]

"As we decided I have contacted Isern Drilling Company and arranged for them to drill the test well on the Gemeinhardt lease, commencing before the committment date, being September 26, 1967. You have agreed to bear the cost provided in the turnkey drilling contract. If the well is productive you will bear the cost of equipping the well for production.

"We have agreed that I and my brother Bill shall have what is known in the industry as a 50% carried interest in this well and the future events in the lease. In other words, you advance and pay the costs of drilling and equipping the wells on the lease and you are to receive all the net proceeds from the production of oil and gas from all of the wells until such time as you have received a sum totaling all such costs. At that time and thereafter I and William F. Martin shall have a 50% interest in the lease and the wells thereon and the equipment in, on and for the well or wells.

"I herewith hand you an assignment of oil and gas lease executed by me, joined by my wife, to initially vest all title to the Gemeinhardt lease in you. At such time as you have recovered your costs in the lease and its development, you are to execute a reassignment to me, and William F. Martin, of 50% interest in the lease as then developed.

"Similarly, if we mutually decide to drill a well or wells on the Reichuber

and/or Bieberle leases, and you undertake the cost of drilling the well or wells and equipping the same, I and William F. Martin shall have a 50% carried interest. It is understood that your cost of drilling and equipping is cumulative and you shall recover the costs of drilling and equipping of all wells from all the net proceeds from all wells on the leases before our 50% interest shall be effective to receive 50% of the proceeds. It is understood also that you may from time to time allow advances to me personally, but such advances shall be also recovered by you from the production before our direct participation."

The agreement initially covered only three leases but it was later extended to cover thirteen others, all of which are the subject of this litigation. Sidney assigned his interest in the three leases to Edwards and a program of development commenced on them and on others acquired by the two. Sidney closed his law office and moved to Tulsa and Great Bend, Kansas, to operate the leases. He drew monthly advances from Edwards, first $500, then $1,000. Edward received all oil runs and has continued to do so. By December, 1969, Edwards had advanced approximately $750,000 for development of the leases.

Because of this heavy investment Edwards became desirous of liquidating his interest in the leases. As a result two written agreements were entered into by Edwards and Sidney on June 26, 1970. One called for the establishment of an operating entity, a corporation to be known as Coronado Petroleum Corporation, to encourage investment by individuals in the leases in order to raise capital to buy out Edward's interest. This corporation was to be organized by Sidney. It was to receive $7,500 fee per month to cover operational and administrative costs. Edwards was to continue paying the fuel, maintenance, well service equipment, salt water disposal, roustabout service, well stimulation, lease rental, etc. required by the leases. The second agreement modified the September 12, 1967, agreement and provided that until May 1, 1971, Sidney would have the exclusive right to sell all of Edward's interest in the leases and from the sale proceeds Edwards would receive return of his $750,000 investment. In the event Sidney could not buy or cause to be sold Edward's interest by May 2, 1971, Edwards would become sole and exclusive owner of the leases and Sidney and William would have no right in them and all agreements between the parties would be terminated. Sidney was to release his interest in the leases and provide Edwards with a release of William Martin's interest. William did not know about the new agreements of June 26, 1970, until about a week after they were signed.

Coronado Petroleum Corporation was never incorporated by Sidney as agreed by him because he did not have the $1,000 capital requirement necessary for incorporation in Oklahoma, although he told Edwards the corporation had been formed. Sidney continued to operate the leases and Edwards performed under the June 26, 1970, agreements until April, 1971, when he learned that although he had been paying the fee of $7,500 per month to Sidney for operation and all bills submitted by Sidney, he was in danger of losing his credit standing because Sidney had allowed $60,000 in unpaid bills to accumulate. Meanwhile Sidney was unable within the allotted time to find other parties who would buy Edwards' interest in the leases or to purchase them himself. Edwards then terminated the agreement with Sidney, claiming the entire interest in the leases in question. By letter dated May 12, 1971, Edwards sent to Sidney releases to be signed by him and his brother William. Later Edwards sued Sidney for $60,000 in state court in Tulsa and recovered judgment against him for $37,000. William was never a party to this suit.

William filed this action against Edwards May 20, 1971. He also joined his brother Sidney as a party defendant but has never sought any relief from him. The case was tried to the court and a general judgment was entered in favor of Edwards in May, 1973. The trial court granted William a new trial because a pretrial order had not been prepared before the first trial. The second trial occurred in October, 1974, further evidence was offered and again judgment was rendered for Edwards. The trial court made the following findings and conclusions:

"1. The Court finds that any recovery allowed in favor of the Plaintiff, William F. Martin, against the Defendants, Sidney A. Martin and R. M. Edwards, must be predicated upon a third party beneficiary agreement.

"2. The Court further finds that the Plaintiff, by his own evidence and by his own testimony, has proven that any purported interest in and to the leases constituting the subject matter of the within captioned action was to be carved out of and granted to him by Sidney A. Martin from the interest of the said Sidney A. Martin, and that it was never contemplated by the parties hereto that the Defendant, R. M. Edwards, would be obligated to carve any interest out of these leases or to deliver the same in favor of or unto the said William F. Martin.

"3. The Court believes that the law of third-party beneficiary is that such a contract for the benefit of a third party may be rescinded or abrogated as the parties see fit without the assent of the beneficiary at any time before the contract is acted upon in a meaningful way, or relied upon to the detriment of the beneficiary, and that a rescission deprives the beneficiary of the benefits that he might otherwise be entitled to.

"4. The Court further finds that the Plaintiff herein, William F. Martin, has not at any time done anything meaningful in reliance upon the contract nor has said Plaintiff changed his position in any manner in reliance upon the receipt of any benefits that Sidney A. Martin may have promised him.

"5. The Court further finds that the contract was rescinded by the action of Sidney A. Martin in entering into the June 26, 1970, agreements and the subsequent failure of the said Sidney A. Martin to purchase the leases described therein or obtain a buyer therefor under the terms and conditions under the said June 26, 1970 agreement.

"6. The Court specifically finds that there was never a promise made or conferred by R. M. Edwards to create an interest in favor of Plaintiff, William F. Martin.

"7. The Court further finds that as between the Plaintiff, William F. Martin, and the Defendant, Sidney A. Martin, that said Sidney A. Martin has been adequately compensated for any services that Sidney A. Martin may have rendered relative to the leases comprising the subject matter of this lawsuit and that the Plaintiff has not performed any substantial services relative to said leases nor had he at any time been promised any interest by way of gift for any services except such as may have been given him by his brother, Sidney A. Martin.

"8. The Court further finds that it would be inequitable and unconscionable to burden the lease interests of R. M. Edwards with any interest in favor of the Plaintiff in this action and that judgment should be rendered in favor of each of the Defendants in this action and against the Plaintiff subject only that since the Defendant, Sidney A. Martin, is in default herein the Court will reconsider granting judgment in favor of the Plaintiff and against the Defendant, Sidney A. Martin, only upon presentation of proper motion therefor."

Appellant William's principal contention is that as a third party beneficiary under the initial contract he had an interest in the leases of which he could not be divested without his consent. He asserts his rights were separate and independent from those of his brother Sidney and there was no collusion between the two brothers. In his petition William did not state in terms of fractions or percentage the particular interest in the leases he was claiming for himself. He merely alleged he and Sidney jointly had a 50% carried interest by virtue of the September 12, 1967, agreement and he asked that the court determine his exact interest. At trial, and now, he asserts ownership of one-half of that 50% interest.

A carried interest in oil and gas in place, as here used, results from an arrangement between two or more co-owners of a working interest whereby one agrees to advance all or some part of development costs on behalf of the others and to recover such advances from future production, if any, accruing to the other owners' share of the working interest. It is customary for a carried interest relationship to cease when development costs are paid; thereafter the

carried and carrying parties jointly own the working interest and share in the costs and receipts (Williams and Meyers, Manual of Oil and Gas Terms, 3d ed., 1971, pp. 49-50; 2 Williams and Meyers, Oil and Gas Law, § 424, pp. 430-431). There are varied types of carried interests but generally the interest of the one who makes the advances for development is known as the carrying interest. The interest of the one for whom advances are made is known as the carried interest (*Bolack v. Sohio Petroleum Company*, 475 F. 2d 259, 260).

The trial court first found that any recovery by appellant Martin had to be predicated upon a third party beneficiary contract. It further found there was never a promise made or conferred by appellee to create a separate interest in the leases in favor of appellant; that any interest of appellant was to be carved out of and granted to him by Sidney from Sidney's interest.

Generally, where a person makes a promise to another for the benefit of a third person, that third person may maintain an action to enforce the contract even though he had no knowledge of the contract when it was made and paid no part of the consideration (*Burton v. Larkin*, 36 Kan. 246, 13 Pac. 398; *Anderson v. Rexroad*, 175 Kan. 676, 266 P. 2d 320). But it is not everyone who may benefit from the performance of a contract between two other persons, or who may suffer from its nonperformance, who is permitted to enforce the contract by court action. Beneficiaries of contracts to which they are not parties have been divided into three classes: Donee beneficiaries, creditor beneficiaries and incidental beneficiaries. Only those falling within the first two classes may enforce contracts made for their benefit (17A CJS, Contracts, § 519 [4] b., p. 964; Accord: *Burton v. Larkin*, supra). These third person beneficiaries are defined in 2 Williston on Contracts, 3d ed., § 356, as follows:

". . . (1) Such person is a donee beneficiary if the purpose of the promisee in obtaining the promise of all or part of the performance thereof, is to make a gift to the beneficiary, or to confer upon him a right against the promisor to some performance neither due [nor supposed] or asserted to be due from the promisee to the beneficiary; (2) such person is a creditor beneficiary if no intention to make a gift appears from the terms of the promise, and performance of the promise will satisfy an actual [or supposed] or asserted duty of the promisee to the beneficiary; (3) such person is an incidental beneficiary if the benefits to him are merely incidental to the performance of the promise and if he is neither a donee beneficiary nor a creditor beneficiary." (pp. 824-827.)

(Accord: Restatement of the Law of Contracts, § 133, pp. 151-152. Restatement, Contracts, 2d, Revised Tentative Draft, 1973, § 133, pp. 285-286, divides contract beneficiaries into two classes— intended and incidental).

The rule respecting incidental beneficiaries is stated in 17 Am. Jur. 2d, Contracts, § 307, as follows:

". . . A mere incidental, collateral, or consequential benefit which may accrue to a third person by reason of the performance of a contract, or the mere fact that he has been injured by the breach thereof, is not sufficient to enable him to maintain an action on the contract. Where the contract is primarily for the benefit of the parties thereto, the mere fact that a third person would be incidentally benefited does not give him a right to sue for its breach. . . ." (p. 733.)

Various tests have been used elsewhere in drawing the line between classes of beneficiaries. In *Burton v. Larkin, supra,* this court held: "It is not every promise made by one to another from the performance of which a benefit may inure to a third, which gives a right of action to such third person, he being neither privy to the contract nor to the consideration. *The contract must be made for his benefit as its object, and he must be the party intended to be benefited in order to be entitled to sue upon it.*" (Syl. para. 3.) (Emphasis supplied.) Under this test a beneficiary can enforce the contract if he is one who the contracting parties intended should receive a direct benefit from the contract (see anno. Contract-Enforcement by Person Benefited, 81 ALR 1271, § III *d.,* p. 1286). We think this test is sound and are content to reaffirm it. Contracting parties are presumed to act for themselves and therefore an intent to benefit a third person must be clearly expressed in the contract (*Ronnau v. Caravan International Corporation,* 205 Kan. 154, 159, 468 P. 2d 118). It is not necessary, however, that the third party be the exclusive beneficiary of all the promisor's performance. The contract may also benefit the contracting parties as well (17 Am. Jur. 2d, Contracts, § 306, pp. 731-732; 17A CJS, Contracts, § 519 [4] f., p. 983).

The determination of the intent of the contracting parties as to rights of a third party beneficiary is a question of construction for the court and the general rules for the construction of contracts apply. The intention of the parties and the meaning of the contract are to be deduced from the instrument where its terms are plain and unambiguous (*Anderson v. Rexroad, supra*). However, facts and circumstances surrounding its execution become competent in

the event the instrument is ambiguous on its face and requires aid to clarify its intent.

What did Sidney and appellee intend here? As already shown the evidence indicated oral agreement between them as to their venture had already been reached when appellant first mentioned to appellee that he had brought Sidney and appellee together but had been "left out". The further testimony on this was that appellee told appellant he would talk to Sidney and see if Sidney would give appellant a part of his interest. Appellee than told Sidney, "I will provide the money to drill the well with this proviso, that when I get the money, my money back out of production, we will own it fifty-fifty, and I would ask you take care of Bill [meaning appellant]". Sidney acknowledged he was to take care of appellant. Appellant testified as follows respecting the conversation:

"Q. But he didn't designate anything to be considered, did he?
"A. Only to take care of me, was his words.
"Q. But wasn't that what he told your brother Sid to do?
"A. Yes sir. I was there at the time.
"Q. As far as Mr. Edwards is concerned, he just threw out a fifty percent carried interest to Sid and expressed the hope that Sid would take care of you, isn't that really it?
"A. Yes, sir, I can see that would be.
"Y. Okay. He didn't give any more because you were in it, than he would have given as far as your brother Sid is concerned, as I understand it?
"A. I think that is correct.
"Q. Then your interest was really covered with Sid's interest, is that right?
"A. Yes, sir."

Sidney gave this further testimony:

"Q. And you understood, and understood clearly, that you were the one to take care of him, did you not?
"A. It was clear that out of the fifty percent interest that would be attributable to me for my private interest in the leases, which was fifty percent, I was to take care of Bill."

Appellant was specifically mentioned in the September 12, 1967, memorandum; however, his interest was not specified apart or separate from that of his brother Sidney. The agreement clearly contemplated operation of the leases by Sidney, which by the time he prepared the memorandum he had commenced by arranging for test drilling, and for which he would receive advances for his services. Mutual promises were involved. Appellant's part in the enterprise was not stated and indeed it appears none was contemplated because agreement as to the enterprise had already been reached by Sidney and appellee prior to appellant's inclusion in it.

(It is true appellant later performed some service in connection with the leases, an aspect to be mentioned in considering another point raised by him.) The contract must be considered ambiguous and resort to extrinsic evidence is proper. What does seem clear from that evidence is that, as found by the trial court, anything appellant was to receive was to come from his brother Sidney through Sidney's interest in the venture rather than from a separate share in the whole. Sidney was to "take care of" appellant out of his interest. Sidney had to profit before appellant could profit. Nothing in the record indicates that appellee intended that William should be a donee beneficiary of any separate interest in the leases. There is indication in Sidney's testimony he was amenable to appellant becoming a donee beneficiary under the written contract and even sharing equally with him but the trial court was not obliged to accept this version and obviously did not. Appellant at best had no more right to enforce the contract than an incidental or indirect beneficiary. The result is appellee was free to deal with Sidney as the two might choose with respect to their own contractual rights. When Sidney defaulted and forfeited those rights he had no interest in the leases which appellant could share and appellant had no redress against appellee.

Appellant further complains there was no evidence to support the trial court's findings he had done nothing meaningful in reliance upon the contract and that it would be inequitable and unconscionable to burden appellee's interest with any charge in favor of appellant. These findings were somewhat in the nature of makeweight. The first was made to indicate that appellant would not be entitled to recover even if treated as a donee beneficiary of a contract later rescinded by the principals. There was testimony appellant had kept a file on events relating to the entire development; he had relayed communications and information from Sidney to appellee during the progress of events as they had occurred and had gone to the area in question on occasion to "sit" on a well as it was being brought in. During all this time he had, however, remained on the payroll of appellee's company and was compensated by it for his time and services rendered. He did list an interest in the leases on a financial statement submitted to a Sand Springs, Oklahoma, bank but he made no showing of any detriment or change of position by reason of the contract upon which he relied. The second finding similarly took into account the fact appellant was being paid by appellee's company for his services and it may further have been

made in anticipation of an argument by appellant that by October, 1974, appellee would be close to recoupment of his investment and still have all the leases. The assumption that appellee would then have nearly recovered his expenditures was based on inferences in the testimony which are largely speculative in that they assume both production and expenses beyond a particular time would have remained the same—something which appellee points out is not customary in the oil industry and in fact did not happen in the case at bar.

Appellant makes the further contention the trial court erred in not applying joint venture, trust and real property law so as to permit his recovery herein; however, under these headings nothing tenable as to require any further discussion has been presented.

The judgment is affirmed.

APPROVED BY THE COURT.