No. 57,366

JACK CORNWELL, *et al.*, *Plaintiffs-Appellees*, v. JERRY JESPERSEN *et al.*, *Defendants-Appellants*, RICK CORNWELL, *et al.*, *Plaintiffs-Appellees*, v. JERRY JESPERSEN, *et al.*, *Defendants-Appellants*.

(708 P.2d 515)

Opinion filed October 25, 1985.

*J. D. White*, of Wichita, argued the cause and was on the briefs for the appellants.

*Dale J. Paulsen*, of St. John, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an action by Rick, Joe, Jack and June Cornwell and Martha Cornwell Riddell (plaintiffs-appellees) against Jerry Jespersen, and Big J. Production Co., Inc., (defendants-appellants) for damages to the plaintiffs' crops and land alleged to have resulted from the defendants' oil drilling activities on their land. The trial court held that the plaintiffs could maintain an action against the defendants as they were third party beneficiaries to the drilling contract between defendants and plaintiffs' lessee. The court awarded actual damages totalling $3,772 and punitive damages of $1,980. The defendants' appeal claiming the trial court erred in its conclusion that the plaintiffs were third party beneficiaries to the contract, in considering parol evidence when interpreting the drilling contract, in awarding punitive damages, and in finding that a letter dated March 13, 1982, from the lessee to the defendants was not an accord and satisfaction.

Rick and Joe Cornwell and Martha Cornwell Riddell are the joint owners of a certain parcel of land in Stafford County. Jack, June, Rick and Joe Cornwell and Martha Cornwell Riddell are the owners of a separate parcel, also in Stafford County. In August of 1980, Rick, Joe and Martha entered into an oil and gas lease with Dennis Tajchman as lessee. Also in August of 1980, Jack, June, Rick, Joe and Martha leased their land to Alta, Inc. The leases—for purposes of this appeal—are identical. Each contained supplemental provisions, including the following conditions:

"2.d. Lessee shall pay for all loss of crops and damages to the land occasioned by its operations.

. . . .

"4. Lessee agrees that all pits constructed on the premises in connection with

drilling operations shall be at lease five feet (5') deep, or deeper. The top two feet (2') of soil shall be segregated so that upon refilling of the pits said two feet of top soil may be replaced on the top of the filled pits. In the construction of said pits an additional excavation of at least three feet deep shall be made diagonally from corner to corner of said pits so that in the event of a dry hole the mud and fluid from any pit shall be pumped into the drill hole before it is plugged and that after said pits have thoroughly dried, Lessee, at the time requested by Lessor, shall refill and level all pits to the surface level of the adjoining land.

"It is further agreed that if any drill site or test is abandoned that the surface pipe shall be cut off not less than six feet (6') below the surface so as not to interfere with future farming operations."

. . . .

"6. It is further agreed that Lessee shall be liable for all damages caused to the Lessor by reason of oil, salt water, or other fluid resulting from Lessee's operations, and that in the event the Lessee permits any such liquids to run over the surface of said premises, such oil or liquids shall be scraped up to a depth of the soil saturation and removed, or buried on the premises at a minimum depth of thirty-six inches (36") and any depressions resulting therefrom shall be refilled with good clean top soil, and leveled to the surrounding surface. In connection therewith, Lessee shall have the right to use top soil from the leased premises for the purpose of filling any such depressions."

Eventually, both leases were assigned to Quadel Energy Corporation (hereinafter, Quadel).

On May 15, 1981, Quadel entered into a turnkey-type drilling contract with the defendant Jerry Jesperson. The contract provided that Jesperson was to: drill test wells after obtaining the necessary permits; provide all material, supplies, and labor; maintain records as required by law; obtain and maintain workers' compensation insurance; pay all charges for labor or materials incurred; prevent the filing of any liens; and have independent contractor status. The contract also contained the following provision:

"5. (a) The Driller shall indemnify, defend and save the Partnership harmless from any and all claims made by or liability to any third party (including any employee of the Driller or any subcontractor thereof) for personal injury or property damage arising out of the drilling and other activities to be performed hereunder, including any liability for injury or damage arising out of any blow-out, explosion or other accident with respect to any well drilled hereunder."

Attached to, and part of, the drilling contract was a list of costs in the turnkey agreement. Specifically included in this list were the following: "Fill Pits . . .; Restore Location . . .; Damages." The total cost per well drilled under the contract was stated as being $90,740.

Among the seven wells drilled on various leases by the defendants were two test wells drilled on both parcels of land owned by the plaintiffs. Both wells were abandoned as dry holes. Although the defendants filled the pits, they failed to remove the drilling mud from the pits or to cover them properly which resulted in mud overflowing and covering the land surface. They did not cut off the surface pipe to the six-foot depth required by the lease, nor did they restore the surface of the drill site to farmable condition. The defendants caused injury to the plaintiffs' land and crops, but they did not pay damages for either.

On March 13, 1982, Jespersen received a letter from Quadel which began by stating, "This letter sets forth the agreements we have reached as a result of our negotiations over the past several days." It further stated, "[I]t is now desired that an *accord and satisfaction* be agreed to with respect to *all* obligations and liabilities existing between you on the one hand, . . . and the partnerships on the other. Accordingly, we have agreed to pay you the total sum of $958,000." (Emphasis added.) The letter then recited specific obligations still to be performed by the defendants. No mention was made of "filling the pits, restoring the surface or paying damages" to the landowners in connection with their leases.

Finally, the letter included the following agreement, "all payments, assignments, bills of sales and other matters provided for herein shall be paid, made and delivered between us on or before the 19th day of March, 1982, in Wichita, Kansas *or this agreement is void and of no further legal force and/or effect.*" (Emphasis added.) At the time of the hearing held on December 14, 1982, Jespersen admitted he had not yet performed all of his obligations as stated in the letter.

On June 24, 1982, Quadel sent a "demand" letter to the defendants stating, "We simply cannot understand why the few matters remaining to be accomplished to complete the settlement reached in March have not been done." The letter listed the defendants' remaining obligations. Included in the list was, "[defendants] must settle immediately all claims for damages outstanding with landowners and tenants."

In a reply letter from Jespersen to Quadel, Jespersen stated, "We are negotiating the claims on . . . the [Cornwell lease] . . . . These will be settled in the near future."

On October 7, 1982, Rick and Joe Cornwell and Martha Corn-well Riddell filed a petition against the defendants, requesting $1,700 actual damages and $3,000 punitive damages (Case No. 83-C-10). On the same day, Jack, June, Rick and Joe Cornwell and Martha Cornwell Riddell petitioned for judgment against the defendants in the amount of $750 actual and $1,500 punitive damages (Case No. 83-C-9).

The plaintiffs brought their actions on the contract alleging they were third party beneficiaries under the drilling contract between Quadel and the defendants. The defendants answered by denying the third party beneficiary status affirmatively pleading an accord and satisfaction by virtue of the letter dated March 13, 1982, as a bar to the plaintiffs' claims.

The cases were consolidated for trial. The cases, brought under Chapter 61 as limited civil actions, were heard by a magistrate judge on December 14, 1982. After the plaintiffs presented their evidence, the defendants moved for dismissal arguing that the plaintiffs had failed to present sufficient evidence to establish their position. The motion was overruled. Jespersen announced to the court he would stand on the questions of law raised by the motion and presented no evidence.

The magistrate judge entered judgment for the plaintiffs against the defendants in both cases. In case No. 83-C-10, the plaintiffs were awarded actual damages of $3,020 and punitive damages of $1,980. In case No. 83-C-9, the plaintiffs were awarded only actual damages of $750.

The defendants appealed to the district court. In a memorandum opinion dated February 24, 1984, the district court affirmed the decision of the magistrate judge in both cases.

The defendants then moved for a new trial alleging there was newly discovered evidence stating that all of the defendants' obligations—as set forth in the March 13 letter—had been fully performed since the trial. A hearing was held on May 24, 1984, and the motion was overruled. The defendants then duly perfected their appeal to this court.

The first issue is whether the lower court erred in finding the plaintiffs were third party beneficiaries to the drilling contract. The magistrate judge based his ruling on Exhibit A attached to the drilling contract which included the requirement that Jespersen fill the pits, restore the location, and pay the land

damages. The judge found that the parties, by including these requirements, intended to benefit the plaintiffs, and, therefore, the plaintiffs were third party beneficiaries and had standing to sue on the contract.

This court discussed the law of third party beneficiary contracts in *Martin v. Edwards*, 219 Kan. 466, 472-73, 548 P.2d 779 (1976):

"Generally, where a person makes a promise to another for the benefit of a third person, that third person may maintain an action to enforce the contract even though he had no knowledge of the contract when it was made and paid no part of the consideration (*Burton v. Larkin*, 36 Kan. 246, 13 Pac. 398; *Anderson v. Rexroad*, 175 Kan. 676, 266 P.2d 320). But it is not everyone who may benefit from the performance of a contract between two other persons, or who may suffer from its nonperformance, who is permitted to enforce the contract by court action. Beneficiaries of contracts to which they are not parties have been divided into three classes: Donee beneficiaries, creditor beneficiaries, and incidental beneficiaries. Only those falling within the first two classes may enforce contracts made for their benefit (17A CJS, Contracts, § 519[4]b., p. 964; Accord: *Burton v. Larkin*, [36 Kan. 246]). These third person beneficiaries are defined in 2 Williston on Contracts, 3d ed., § 356, as follows:

" '. . . (1) Such person is a donee beneficiary if the purpose of the promisee in obtaining the promise of all or part of the performance thereof, is to make a gift to the beneficiary, or to confer upon him a right against the promisor to some performance neither due [nor supposed] or asserted to be due from the promisee to the beneficiary; (2) such person is a creditor beneficiary if no intention to make a gift appears from the terms of the promise, and *performance of the promise will satisfy an actual* [or supposed] or asserted *duty of the promisee to the beneficiary* [emphasis added]; (3) such person is an incidental' beneficiary if the benefits to him are merely incidental to the performance of the promise and if he is neither a donee nor a creditor beneficiary.' (pp. 824-827.)

"(Accord: Restatement of the Law of Contracts, § 133, pp. 151-152. Restatement, Contracts, 2d, Revised Tentative Draft, 1973, § 133, pp. 285-286, divides contract beneficiaries into two classes—intended and incidental)."

The court then went on to state:

"Various tests have been used elsewhere in drawing the line between classes of beneficiaries. In *Burton v. Larkin*, [36 Kan. 246], this court held: 'It is not every promise made by one to another from the performance of which a benefit may inure to a third, which gives a right of action to such third person, he being neither privy to the contract nor to the consideration. *The contract must be made for his benefit as its object, and he must be the party intended to be benefited in order to be entitled to sue upon it.* (Syl. Para. 3.) (Emphasis supplied [in *Martin*].) Under this test a beneficiary can enforce the contract if he is one who the contracting parties intended should receive a·direct benefit from the contract (see anno. Contract-Enforcement by Person Benefited, 81 ALR 1271, § III *d.*, p. 1286). We think this test is sound and are content to reaffirm it. Contracting

parties are presumed to act for themselves and therefore an intent to benefit a third person must be clearly expressed in the contract (*Ronnau v. Caravan International Corporation*, 205 Kan. 154, 159, 468 P.2d 118). *It is not necessary, however, that the third party be the exclusive beneficiary of all the promisor's performance. The contract may also benefit the contracting parties as well* (17 Am. Jur. 2d, Contracts, § 306, pp. 731-732; 17A CJS, Contracts, § 519[4]f., p. 983)." (Emphasis added.) 219 Kan. at 473.

## The Restatement (Second) of Contracts § 302 (1979), states:

"(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

"(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

"(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

"(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."

The law on third party beneficiary contracts, as stated in *Martin v. Edwards*, 219 Kan. 466, was upheld in *Holiday Development Co. v. Tobin Construction Co.*, 219 Kan. 701, 549 P.2d 1376 (1976). We adhere to the law as set out in *Martin*.

This case is to be distinguished from *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982), where the action was brought on a tort theory. The court there relied upon Restatement (Second) of Torts § 324A (1965).

In determining the intent of the contracting parties as to rights of a third party beneficiary, we must apply the general rules for construction of contracts. The intention of the parties and the meaning of the contract are to be determined from the instrument itself where the terms are plain and unambiguous. *First Nat'l Bank & Trust Co. v. Lygrisse*, 231 Kan. 595, 647 P.2d 1268 (1982); *Anderson v. Rexroad*, 175 Kan. 676, 679, 266 P.2d 320 (1954).

Regardless of the construction of a written instrument made by the trial court, on appeal the instrument may be construed and its legal effect determined by the appellate court. *Hall v. Mullen*, 234 Kan. 1031, 678 P.2d 169 (1984). Accordingly, we find that the terms of the drilling contract involved in this case are express, clear and unambiguous. It follows that the language in the contract must be given its plain and ordinary meaning without resort to further rules of construction.

It must be noted the trial court erred in the admission of oral

testimony to explain the unambiguous drilling contract, but the error is harmless because the trial court reached the correct decision as to the intent of the parties and the purpose of the contract for the reasons hereafter stated. *City of Ottawa v. Heathman*, 236 Kan. 417, 426, 690 P.2d 1375 (1984); *Home Ins. Co. v. Atchison, T. & S. F. Rly. Co.*, 189 Kan. 316, 319-20, 369 P.2d 338 (1962).

Were the plaintiffs intended beneficiaries of the drilling contract?

The plaintiffs argue, in support of their status as intended beneficiaries, that the "indemnity clause" contained in the drilling contract clearly shows the parties intended to benefit the plaintiffs. We disagree. In 2 Williston on Contracts, § 403 (3d ed. 1959), it is stated:

"A mere promise to indemnify against damages must also be distinguished. Here the promisor's liability does not arise until the promisee has suffered loss or expense. Until then the promisee has no right of action, and consequently one claiming damages can assert no derivative right against the promisor, much less a direct right."

Despite this fallacious argument by the plaintiffs, we agree with the trial court's conclusion that the plaintiffs were intended beneficiaries of the drilling contract.

Since the purpose of the drilling agreement was not to make a gift to the plaintiffs, the plaintiffs were not donee beneficiaries. To find the plaintiffs were "intended" beneficiaries who are thereby permitted to enforce the contract in this case, we must find they were creditor beneficiaries. As defined in *Martin*, a person is a creditor beneficiary when "no intention to make a gift appears from the terms of the promise, and performance of the promise will satisfy an actual [or supposed] or asserted duty of the promisee to the beneficiary." *Martin v. Edwards*, 219 Kan. at 472.

The promisee in this case—Quadel—owed certain duties to the plaintiffs under the oil and gas lease. The lease provided that the lessee (Quadel) was to perform the following duties in connection with any drilling operations on the plaintiffs' land: Pay crop and surface damage, dig pits at least five feet deep, pump mud and fluid from the pit into the drill hole, cut off surface pipe to six feet below the surface, and restore the surface.

Rather than performing the drilling operations, Quadel entered into a drilling agreement with the defendants wherein the

defendants were to perform all drilling operations on the plaintiffs' land. Included in the contract was a breakdown of "costs included in the turnkey agreement." Among Jespersen's duties in connection with drilling the test wells was that he would fill the pits, restore the surface, and pay for any damages caused by his operations.

Clearly, if the defendants had fulfilled these duties, "the performance of the promise [would have satisfied] an actual [or supposed] or asserted duty of the promisee to the beneficiary." Since the defendants assumed duties owed to the plaintiffs by Quadel, the plaintiffs are creditor beneficiaries under the drilling contract and have a right to enforce the same.

The defendants next contend the lower court erred in finding the letter dated March 13, 1982, which was sent to Jespersen by Quadel and subsequently executed by both parties, was not an accord and satisfaction. Jespersen argues the court should have found it to be a valid accord and satisfaction or a novation, thus barring the plaintiffs from the enforcement of the original contract. The lower court found—based on the testimony at the time of trial—that while the letter was an "accord" there had been no satisfaction and, therefore, the plaintiffs were not barred from enforcing the original contract.

Regardless of the trial court's construction of the written instrument, the instrument may be construed and its legal effect determined by this court on appeal. *Hall v. Mullen*, 234 Kan. 1031.

In *Thompson v. Meyers*, 211 Kan. 26, 505 P.2d 680 (1973), we held in order for an accord and satisfaction to be effective, both the accord *and the satisfaction* must be established. See also *Coffeyville State Bank v. Lembeck*, 227 Kan. 857, 610 P.2d 616 (1980). In *Manning v. Woods, Inc.*, 182 Kan. 640, 643, 324 P.2d 136 (1958), this court stated that, "an accord and satisfaction is the adjustment of a disagreement as to what is due from one party to another and the payment of the agreed amount." Therefore, before an accord can operate as a bar to the assertion of the original contract, it must be followed by a satisfaction. If it has not been followed by a satisfaction, it has no effect. See *Lighthouse for the Blind v. Miller*, 149 Kan. 165, 86 P.2d 508 (1939).

The letter of accord stated, "[W]e have agreed that all payments, assignments, bills of sales and other matters provided for

herein shall be paid, made and delivered between us on or before the 19th day of March, 1982 . . . *or this agreement is void and of no further legal force and/or effect.*" (Emphasis added.) It was established at trial, by Jespersen's own testimony, that he had not yet performed all of his obligations as listed in the "accord" letter. The date of the hearing was December 14, 1982. Clearly, the defendants failed to establish that these matters had been satisfied by March 19, 1982. Thus, the agreement terminated on March 19, 1982, and no longer had any force or effect.

This finding is supported by a reply letter, dated July 6, 1982, from Jespersen to Quadel in which Jespersen stated he was negotiating claims with Cornwell. The settlement agreement made no mention of the defendants' duty to settle landowners' claims. Therefore, had the defendants believed the settlement agreement was still in effect, they would not have had any reason or obligation to "negotiate claims." The June 1982 letter of Quadel to which Jespersen responded listed the things left to be done by the defendants; among those was the defendants' obligation to settle all claims with the landowners.

The defendants further contend this court should find the agreement is a novation, thus nullifying the original contract. The defendants did not raise the issue of a novation at the trial. A point not presented to the trial court may not be raised for the first time on appeal. *Lostutter v. Estate of Larkin,* 235 Kan. 154, 166, 679 P.2d 181 (1984); *Brick v. Fire Insurance Co.,* 117 Kan. 44, 45-46, 230 Pac. 309 (1924).

Even if the defendants had presented this issue below, we do not find the agreement was a novation. The purpose of the March 13 letter was to extinguish the parties' existing obligations to each other. It did not create new obligations. The effects of "novation" and "accord and satisfaction" are distinguished in 1 Am. Jur. 2d, Accord and Satisfaction § 3, as follows: "[A] novation implies the extinction of an existing debt or obligation and its transition into a new one between the same or other parties, whereas an accord and satisfaction relates solely to extinguishing the debt or obligation."

Accordingly, we find that the letter of March 13 did not operate as a "novation" of the original contract.

We conclude the trial court was correct in finding the plaintiffs were permitted to sue on the original contract as intended beneficiaries.

The defendants next contend the trial court erred by awarding punitive damages to the plaintiff. The trial court, in its memorandum opinion, reasoned as follows:

"The Court, with regards to punitive damages, finds the defendant, has wilfully and wantonly disregarded the rights of the plaintiff, by his failure to perform his duties as required by the oil and gas lease and the operating agreement. The Court finds there is a wilful breach of the oil and gas lease and also that of the operating agreement.

"The Court enters judgment for punitive damages against the defendant in the amount of $1980.00."

Under Kansas law, breach of a contract, standing alone, does not call for punitive damages even if the breach is intentional and unjustified, but such damages are allowable if there is some independent tort indicating malice, fraud, or wanton disregard of the rights of others. *Gonzalez v. Allstate Ins. Co.*, 217 Kan. 262, 535 P.2d 919 (1975). Wantonness is characterized by a realization of imminence of damage to others and a restraint from doing what is necessary to prevent the damage due to indifference as to whether it occurs. *Boehm v. Fox*, 473 F.2d 445 (10th Cir. 1973).

This court, in *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co*, 232 Kan. 76, 78-79, 652 P.2d 665 (1982), discussed the exception to the rule against punitive damages in breach of contract actions as follows:

"This exception . . . is recognized when some independent tort or wrong results in additional injury which justifies the assessment of punitive damages by way of punishment of the wrongdoer. In such a case the proof of the independent tort must indicate the presence of malice, fraud or wanton disregard for the rights of others. *The difference between a tort and contract action is that a breach of contract is a failure of performance of a duty arising under or imposed by agreement; whereas, a tort is a violation of a duty imposed by law.*" (Emphasis added.)

This rule was recently applied in *Plains Resources, Inc. v. Gable*, 235 Kan. 580, 682 P.2d 653 (1984). *Plains* also involved an action for breach of an oil and gas drilling contract in which the trial court's award of punitive damages was challenged. In *Plains*, an employee of the oil drilling company had intentionally sabotaged a hole which had been partially drilled to the contracted-for depth. This court held that the employee's action clearly constituted an independent tort which caused additional injury. Therefore, the trial court had not erred in awarding punitive damages.

The case at hand is readily distinguishable from *Plains*. All injury to the plaintiffs flowed directly from the breach of the defendants' contractual duty to fill the holes, restore the surface and pay damages. Their failure to do so—even if intentional or unjustified—was not an independent tort causing *additional* injury.

Accordingly, we conclude there was no independent tort upon which any punitive damages could be predicated in this case. The punitive damage award of $1,980 must be vacated.

Finally, the defendants contend the trial court erred in over-ruling their motion for a new trial. The defendants' motion alleged that there was newly discovered evidence to show that all of the conditions of the March 13 "accord" had been "satisfied" since the date of the trial.

Since we have held that the settlement agreement terminated by its own terms prior to trial, this issue is without merit and warrants no further discussion.

The judgments relative to actual damages are affirmed; the judgment awarding punitive damages is reversed and vacated.