Paul B. NUNN, Gene Miles and John S. Hoover, Plaintiffs–Appellants,

v.

CHEMICAL WASTE MANAGEMENT, INC., a Delaware corporation, and Waste Management, Inc., a Delaware corporation, Defendants–Appellees,

United States of America, Amicus Curiae.

Paul B. NUNN, Gene Miles and John S. Hoover, Plaintiffs–Appellees,

v.

CHEMICAL WASTE MANAGEMENT, INC., a Delaware corporation, and Waste Management, Inc., a Delaware corporation, Defendants–Counterclaimants–Appellants,

United States of America, Amicus Curiae.

Nos. 85–1509, 85–1570.

United States Court of Appeals, Tenth Circuit.

Sept. 2, 1988.

Thomas A. Wood, Wichita, Kan. (H.E. Jones, William R. Smith and David J. Morgan of Hershberger, Patterson, Jones & Roth, Wichita, Kan., with him, on the briefs), for plaintiffs/appellants.

Robert L. Driscoll of Stinson, Mag & Fizzell, Kansas City, Mo. (Catherine M. Hauber and Mary Ann Tyrrell of Stinson, Mag & Fizzell, Kansas City, Mo., Steve A. Leben of Stinson, Mag & Fizzell, Overland Park, Kan., and William Tinker of McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, Kan., with him, on the briefs), for defendants/appellees.

F. Henry Habicht, II, Asst. Atty. Gen., Martin W. Matzen and Blake A. Watson, Attys., Dept. of Justice, Washington, D.C., Francis S. Blake, Gen. Counsel, and Gail Cooper, Atty., E.P.A., Washington, D.C., of counsel, filed a brief on behalf of amicus curiae.

Before LOGAN, SETH and BARRETT, Circuit Judges.

SETH, Circuit Judge.

This action for breach of contract was brought by Paul B. Nunn, Gene Miles and John S. Hoover, the former owners of a corporation named National Industrial Environmental Services, Inc. (NIES), against Chemical Waste Management, Inc. (Chemical Waste), the purchaser of the shares of the corporation, and Waste Management, Inc. (Waste Management), Chemical Waste's parent and sole shareholder. In their suit, the former owners alleged that Chemical Waste had breached its contractual duty of payment on a promissory note of $2,400,000.00 that it had executed in their favor in exchange (with some cash) for all the outstanding stock of NIES. The former owners also sought to hold Waste Management liable as guarantor for an accelerated payment of the note.

Chemical Waste and Waste Management counterclaimed against the former owners, stating causes of action for negligence, breach of warranty, and violations of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*

After a bench trial, the trial court denied recovery on all of plaintiffs' causes of action and entered judgment on defendants' counterclaim for breach of warranty. As damages, the trial court awarded Chemical Waste and Waste Management $1,710,400.00 in lost profits and $6,964,942.17 for costs to remedy contamination through August 30, 1984. The trial court also conditionally awarded $2,000,000.00 in damages for future remediation costs. Both sides have appealed.

We considered the appeals previously and remanded the cases to the trial court because the issues could not be fully decided by consideration of either claim. We there held that the CERCLA issue was an essential element of the appeal, and it had not been decided by the trial court.

The facts are not in dispute. Chemical Waste owns and operated a nationwide network of industrial waste facilities. In 1979, officers of Chemical Waste initiated negotiations for the acquisition of NIES. NIES was an attractive takeover target because it owned a permitted industrial waste disposal facility near Wichita, Kansas. During negotiations on the terms of the corporate acquisition the attorneys for Chemical Waste and NIES exchanged three drafts of an acquisition agreement. In each draft, counsel for NIES requested and received changes in the contractual language, including amendments to the warranties being made by the former owners

of NIES. The final acquisition agreement was executed between the former owners and Chemical Waste on May 14, 1980. As consideration for all the outstanding stock in NIES, Chemical Waste made a $500,-000.00 cash payment to the former owners and gave its promissory note for $2,400,-000.00 which was guaranteed by Waste Management.

The former owners of NIES made numerous warranties regarding NIES's industrial waste facility to Chemical Waste in the final acquisition agreement. The trial court found that the former owners warranted, *inter alia:*

"a. That the operations of NIES were in compliance with all applicable laws, regulations and its permits;

"b. That from the inception of its operations NIES had been in compliance with all applicable laws, regulations and its permit;

"c. That the NIES financial statements were complete;

"d. That there were no undisclosed, fixed or contingent liabilities."

The trial court further found that "[u]nder the [acquisition] Agreement, the warranties were deemed effective as of December 15, 1980," and that Chemical Waste "would not have bought NIES without the warranties that its site complied with all applicable laws."

Thirteen months after Chemical Waste acquired NIES, and had been operating the plant, the facility was closed by the Kansas Department of Health and Environment (KDHE) because toxic wastes were leaking from the facility's ponds and polluting nearby groundwaters. The trial court found that

"[t]he groundwater pollution which caused the NIES site to be shut down in 1982, began during the early phase of [the former owners'] operation of the NIES facility, continued thereafter during [the former owners'] operation, up to and including the time of sale to Chem[ical] Waste...."

To ameliorate the polluting of the leakage Chemical Waste and Waste Management undertook various remediation efforts all of which were either required or approved by the State of Kansas. As of the time of trial Kansas authorities had not permitted the Wichita facility to recommence operations. However, no direct request to reopen may have been made. Shortly after the Wichita facility was closed by KDHE, Chemical Waste notified the former owners that it was suspending payments on the promissory note.

The former owners contend on appeal that the trial court erred in granting judgment for the defendants on the breach of warranty counterclaim. The former owners urge that the trial court misconstrued the warranties contained in the acquisition agreement. Specifically, the former owners maintain that they did not warrant that the Wichita facility did not leak, that the facility's noncompliance with pertinent federal laws and regulations is irrelevant given the wording of the warranties, that they did not warrant facts about which they had no knowledge, and that the warranties contained in the acquisition agreement should be construed against the defendants since their attorney was primarily responsible for drafting the agreement.

At the outset it must be observed that "[t]he intention of the parties and the meaning of the contract are to be deduced from the instrument where its terms are plain and unambiguous." *First National Bank & Trust Co. v. Lygrisse,* 231 Kan. 595, 647 P.2d 1268, 1273 (quoting *Martin v. Edwards,* 219 Kan. 466, 548 P.2d 779, 785–86). In the absence of contractual ambiguity, a trial court's interpretation of the contract presents an issue of law which is reviewed *de novo* on appeal. *See CMI Corp. v. Gurries,* 674 F.2d 821, 825 (10th Cir.); *Duffin v. Patrick,* 212 Kan. 772, 512 P.2d 442, 447–48. In *Teton Exploration Drilling v. Bokum Resources Corp.,* 818 F.2d 1521, 1526 (10th Cir.), we held that "[t]he determination whether a contract provision is ambiguous is a matter of law.... Once a provision is found to be ambiguous, the resolution of its proper meaning is a question of fact, subject to review on a clearly erroneous standard."

▮ Our review of the relevant contractual language leads us to conclude as a matter of law that the warranties made by the former owners are ambiguous insofar as the leakage issue and the applicability of federal laws and regulations are concerned. Accordingly, we review the trial court's resolution of these ambiguities by a clearly erroneous standard.

In Section 2.12 of the acquisition agreement, the former owners warranted that:

"[NIES] is not in default under any law or ordinance, or under any order of any court or federal, state, municipal or other governmental department, commission, board, bureau, agency, or instrumentality wherever located; its operations are in compliance with all applicable laws, permits and ordinances and there are no claims, actions, suits or proceedings pending, or threatened, against or affecting the Company or any Shareholder, at law or in equity, or before or by any federal, state, municipal, or other governmental department, commission, board, bureau, agency or instrumentality, wherever located, which might result in any material adverse change in the financial condition or business of the Company or which would question the validity or propriety of this agreement or of any action taken or to be taken in accordance with or in connection with this agreement."

In Section 2.30 of the acquisition agreement, the former owners warranted that:

"[NIES], from the inception of operation at the [Wichita] Site, has been and is in compliance with the terms, conditions and requirements of all licenses, permits and authorizations it holds and the laws, ordinances and regulations pursuant to which such licenses, permits and authorizations were granted."

We are not persuaded by the former owners' contention that the foregoing warranties do not include within their scope a warranty against leakage at the Wichita waste facility. Although the warranties do not expressly mention leakage, we conclude that the trial court did not clearly err in interpreting these ambiguous contractual warranties to warrant against the leakage

of toxic wastes from the site. Both Sections 2.21 and 2.30 warrant that the Wichita facility is in compliance with all applicable laws. One such law is surely K.S.A. § 65–164 which proscribes the placing, discharging, or permitting the flow of any chemical waste into the waters of the state of Kansas. Contrary to the former owners' argument, we find that K.S.A. § 65–164 is not in conflict with later Kansas enactments dealing with toxic wastes and, accordingly, we conclude that the statute has not been repealed by implication. *See State v. Keeley,* 236 Kan. 555, 694 P.2d 422, 426–27 (to the extent possible, older statute must be harmonized with newer statutes), *Pederson v. Russell State Bank,* 206 Kan. 718, 481 P.2d 986, 990 (repeals by implication are disfavored and such a repeal should not be found if two statutes may operate independently without conflict). When we look at the warranties in the light of the laws of the state of Kansas, as well as in the context of applicable federal law, we are confident that the trial court correctly interpreted the contract to contain a warranty against leakage at the site.

▮ Likewise, we conclude that the trial court did not clearly err in resolving the contractual ambiguity regarding the relevance of pertinent federal laws and regulations. Section 2.17 of the acquisition agreement provides, in pertinent part, that

"the business of [NIES] is subject to certain environmental regulations and that revision of such regulations may occur from time to time and is currently contemplated by the Kansas State Legislature and the Kansas Department of Health and Environment."

Section 2.21 of the acquisition agreement provides:

"If the exchange provided for in this agreement is consummated at the Time of Closing, all of the representations and warranties hereinabove contained in this article will be true and correct at and as of the Time of Closing, with the same force and effect as though made at and as of the Time of Closing, except for

changes contemplated or permitted by this agreement."

The former owners argue that the foregoing sections, read in conjunction with each other, render any violations of the federal Resource, Conservation and Recovery Act of 1976 (RCRA) and CERCLA irrelevant insofar as the contractual warranties are concerned. The former owners premise this contention on the fact that RCRA and CERCLA, both of which became effective during the period of time between the execution of the acquisition agreement and the time of closing, were regulatory "changes contemplated" by the agreement. Accordingly, argue the former owners, RCRA and CERCLA violations were not within the warranties.

As noted above, the trial court found that "the warranties were deemed effective as of December 15, 1980," the date upon which the acquisition of NIES was consummated. Although the trial judge did not so expressly hold, a reading of the findings of fact reveals that the trial court found that RCRA and CERCLA violations were warranted against. We agree and we hold that this interpretation is not clearly erroneous.

Indeed, the very argument advanced by the former owners leads to the conclusion that the parties intended RCRA and CERCLA violations to be within the scope of the warranties. Section 2.21, in effect, provides that the warranties made at the time the acquisition agreement was executed are not static; rather, the parties intended that the warranties would expand or contract along with the "contemplated changes" in the law which transpired prior to the time of closing. While the enactment of RCRA and of CERCLA may have expanded the scope of the warranties beyond that which was warranted at the time the agreement was executed, an expansion was expressly provided for by the terms of the agreement.

We conclude, as mentioned, that the trial court's interpretation that RCRA and CERCLA violations were within the warranties was not clearly erroneous. It is noteworthy that the former owners have not argued that the Wichita facility was in compliance with RCRA and CERCLA at the time the acquisition was consummated.

■ The former owners also argue that they did not warrant conditions or events about which they had no knowledge. The contractual warranties are not ambiguous in this regard. Many of the warranties made by the former owners were expressly made "to the best of [their] knowledge." The face of the agreement leaves no doubt but that the former owners well knew how to limit contractual warranties to the best of their knowledge when they so desired. It is significant, then, that the warranties contained in Sections 2.12 and 2.30 *are not* limited by the former owners' knowledge. In the absence of such a limitation, we conclude that the trial court did not err when it found that the parties intended that such warranties would not be limited by the former owners' knowledge. This is not at all an unusual result. Parties to a contract frequently allocate the risks which may arise from uncontemplated or unknown events and conditions through warranties. "[I]f a material state of facts is warranted to exist which turns out not to be the case, the warrantor is liable for the loss or damage caused; and it is no defense that he acted upon misinformation and in good faith." *Hoffa v. Fitzsimmons*, 673 F.2d 1345, 1358 (D.C.Cir.) (quoting *Pittsburgh Coke & Chemical Co. v. Bollo*, 421 F.Supp. 908, 928 (E.D.N.Y.)).

■ Neither are we persuaded by the former owners' argument that the acquisition agreement, including the warranties contained therein, should be construed against the defendants since the defendants' counsel drafted the agreement. The rule that contracts are to be construed against the draftsperson is simply inapplicable in this case in which the parties brought equal bargaining power to the negotiation table. Moreover, both the former owners and the defendants were represented by counsel during the negotiations and both parties to the agreement had input into the final contractual language. *See Dorchester Exploration, Inc. v. Sunflower*

*Electric Coop., Inc.,* 504 F.Supp. 926, 936 (D.Kan.).

▮ Having concluded that the trial court's interpretation of the contractual warranties was not attended by any error, we further affirm the trial court's conclusion that the warranties were breached. Our review of the record indicates that the trial court did not clearly err in finding that the warranties against leakage and violation of applicable laws and regulations were breached. This finding is supported by the evidentiary facts regarding the shutdown of the Wichita facility and the causes of the groundwater pollution which led to the shutdown. Accordingly, that portion of the damage award which reflects the cost to the defendants of bringing the Wichita facility up to the warranted condition is hereby affirmed.

▮ We cannot affirm, however, that portion of the damage award which was intended to compensate the defendants for their lost profits. The contractual warranties contained in the acquisition agreement were made by the former owners to Chemical Waste. Therefore, Chemical Waste was directly injured by the breach of those warranties. The lost profit injury, on the other hand, was not suffered by Chemical Waste. Rather, the profits were lost by a separate corporate entity, the subsidiary corporation NIES. As a matter of law, it was erroneous for the trial court to disregard the separate entity status of the defendant corporations and the injured corporation. *See McDaniel v. Painter,* 418 F.2d 545, 547 (10th Cir.) (a stockholder who is damaged indirectly may not sue individually to vindicate an injury to the corporation). Accordingly, we reverse the award of damages insofar as that award reflects profits lost by NIES, a corporate entity which was not made a party to this lawsuit.

▮ The final point on appeal raised by the former owners is that the trial court erred in failing to enforce the defendants' contractual obligations because of a "failure of consideration." We agree that the defendants should not have been discharged from their contractual duties and, accordingly, we hold that the defendants remain obligated to pay the balance due on the promissory note to the former owners. The cases cited by the defendants on failure of consideration are inapposite here. By performing on the warranties and paying remediation costs as ordered by the trial court, the former owners will deliver the consideration for which the defendants bargained. Thus, there has been no "failure" of consideration. "The general measure of damages for breach of warranty of quality is the difference between the value of the article actually furnished the buyer and the value the article would have had if it possessed the warranted qualities." Williston, *Contracts* § 1391 (3d ed.1968). In the instant case, the award of remediation costs to the defendants puts them into as good a position as they would have been had the Wichita facility been in the condition warranted by the former owners. To discharge the defendants from their contractual duties while holding the former owners liable on the contractual warranties bestows a windfall on the defendants. "Kansas has recognized that '[t]he basic principle of damages is to make a party whole by putting it back in the same position, not to grant a windfall.'" *State of Kansas v. Wolfenbarger and McCulley, P.A.,* 236 Kan. 183, 690 P.2d 380, 385 (quoting *Service Iron Foundry, Inc. v. M.A. Bell Co.,* 2 Kan.App.2d 662, 588 P.2d 463, 476). Accordingly, we reverse the trial court's decision to discharge the defendants from their contractual obligations.

Finally, we note that the defendants have appealed from the trial court's adverse judgment on their CERCLA counterclaim. When the original appeal was considered by this court, we noted that the record did not provide a sufficient basis for review of the trial court's proceedings on the CERCLA counterclaim. Accordingly, we remanded the case for further proceedings on the CERCLA issues. Unfortunately, the trial court did not develop the CERCLA issues upon remand. Instead, the trial court found that state law provided the parties with all the relief which they requested and again declined to pass upon the merits of the CERCLA claim. Al-

though it is true that state law remedies were available in the instant case, the trial court's calculation of damages could have been significantly affected by a full development of the issues surrounding the CERCLA liability of *both* parties to the acquisition agreement. As noted, NIES under the direction and under the ownership of Chemical Waste operated the facility for over a year. The Third Circuit in *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir.), considered the obligations of entities which were or had operated the facilities. Unless and until the CERCLA issues are fully developed in the district court, however, we are unable to rule upon the CERCLA counterclaim.

WHEREFORE, the trial court's judgment in favor of Chemical Waste and Waste Management on the breach of warranty counterclaim is AFFIRMED insofar as the award of damages for remediation costs is concerned. The trial court's award of lost profits damages is REVERSED, as is the trial court's decision to discharge Chemical Waste and Waste Management from their contractual obligations. This cause is REMANDED to the trial court for modification of the judgment in a manner consistent with this opinion and for further proceedings on the CERCLA issues.