Richard RIGBY, Plaintiff,

v.

**CLINICAL REFERENCE LABORATO-RY, INC. and Trisource Health-care, Inc., Defendants.**

No. CIV. A. 97–2143–GTV.

United States District Court,
D. Kansas.

Feb. 5, 1998.

David W. Hauber, Boddington & Brown, Chtd., Kansas City, KS, for Richard Rigby, plaintiffs.

Patrick J. Doran, Stephen S Brown, Niewald, Waldeck & Brown, P.C., Kansas City,

MO, Frank Saunders, Jr., Wallace, Saunders, Austin, Brown & Enochs, Chartered, Patrick F. Hulla, Overland Park, KS, for Clinical Reference Laboratory, Inc., Health Source, Inc., fka Creekwood Family Care Clinic, Trisource Healthcare, Inc. fka Health Source, Inc. fka Creekwood Family Care Clinic, defendants.

## MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

Plaintiff brings this action alleging claims of breach of fiduciary duty, tortious interference with contract, fraud, conspiracy, breach of contract, negligence per se, and invasion of privacy, all of which arise out of his allegedly "false positive" drug test in March 1993. The case is before the court on the summary judgment motions of defendants Clinical Reference Laboratory, Inc. (Doc. 110) and Tri-Source Healthcare, Inc. (Doc. 78). For the reasons set forth below, the motions are granted.

### I. Factual Background

The following facts are either uncontroverted or based on evidence viewed in a light most favorable to plaintiff. Facts that are immaterial or not properly supported by the record are omitted.[1]

In March 1993, plaintiff Richard Rigby worked as a health physics technician for Power Systems Energy Services, Inc., an independent contractor working with the Wolf Creek Nuclear Operating Corporation (Wolf Creek) to provide radiological surveys. Although an Arkansas citizen at the time, plaintiff temporarily resided in Burlington, Kansas—the site of Wolf Creek's nuclear facility. While working at Wolf Creek, plaintiff was subject to the plant's "fitness for duty" program—a Nuclear Regulatory Commission mandated program requiring certain employees to undergo drug screening.

On March 16, 1993, one of plaintiff's supervisors contacted him at his apartment and instructed him to return to Wolf Creek for a "for cause" drug test. After arriving at the plant's screening area, plaintiff met with Jayne Barnhart Pearson, a Wolf Creek employee working in the access authorization program. Plaintiff then signed a consent form[2] and provided two urine samples for drug screening. Later that day, Wolf Creek officials suspended plaintiff's unescorted access to the facility. Plaintiff subsequently retained attorney Mark Mobley to appeal the procedures utilized in his drug test. In a March 19, 1993 letter to Wolf Creek, Mobley questioned both the manner in which plaintiff's specimens had been gathered and the way in which the chain of custody had been handled.

Although the drug tests were administered, and the resulting samples were initially handled by Wolf Creek personnel, the actual laboratory analysis was conducted by defendant Clinical Reference Laboratory, Inc. (Clinical). Clinical performed this service for Wolf Creek under a contract that specifically incorporates the provisions of both Wolf Creek's "fitness for duty" program as well as all applicable federal regulations pertaining to drug screens for nuclear industry employees. (Pl.'s Resp. to Clinical's Mot. for Summ. J., Boyce Ex. 14). If laboratory tests reveal the presence of drugs in a specimen at or above a specified "cut-off level," Clinical transmits the results to an independent Medical Review Officer (MRO).

Under the guidelines established in the "fitness for duty" program, the MRO is re-

---

1. Plaintiff submitted two voluminous seventy-six page response briefs that are replete with irrelevant information. The documents amount to little more than trial briefs on plaintiff's theories of liability in the case. Moreover, the inclusion of such facts as the personal relationships and social activities of potential witnesses, a state judge's employment resume, the magnitude of typical drug "busts" in a small Kansas town, and a prosecutor's personal opinions on drug crimes serve no purpose other than to waste the court's time and resources. Even if such facts might have some relevancy at trial, a scenario the court finds highly unlikely, they are entirely inconsequential to the issues raised in defendants' summary judgment motions.

2. The consent form states: "I, Richard Rigby, do hereby give my consent to Wolf Creek Nuclear Operating Corporation (WCNOC) and Clinical Reference Laboratory, to perform appropriate tests or examinations on me for drugs. I further give my permission to Clinical Reference Laboratory to release the results on the tests or examinations to the Medical Review Officer, WCNOC (and my employer, if a contract employee)." (Pl.'s Resp. to TriSource's Mot. for Summ. J. at 25, ¶ 76).

sponsible for confirming all positive test results. This responsibility includes contacting test subjects when necessary and investigating any possible alternative medical explanations for the positive result. The MRO then forwards its findings to the appropriate Wolf Creek officials. Defendant TriSource Healthcare, Inc. (TriSource) provides MRO services to Wolf Creek pursuant to a contractual arrangement. (Pl.'s Resp. to Tri-Source's Mot. for Summ. J., Boyce Ex. 13).

On March 23, 1993, Clinical erroneously faxed the results of plaintiff's drug screen to Wolf Creek personnel. At some point shortly thereafter, Clinical forwarded the same information to TriSource. On March 26, 1993, Dr. Timothy Frey, a TriSource employee and MRO, advised plaintiff that one of his urine samples had registered a trace amount (specifically, seven nanograms/milliliter) of marijuana. (Pl.'s Resp. to TriSource's Mot. for Summ. J., Rigby Depo. at 72–73). The "regular" cut-off range for positive tests in Wolf Creek's urine collection policy was fifteen nanograms/milliliter, a fact of which plaintiff was aware at the time he received his test results. (Id. at 164).

In response to Dr. Frey's request for an explanation of the test, plaintiff insisted that he had not used any illegal drugs but expressed that he had been around a number of individuals smoking marijuana at a concert several days prior to the drug screen. (Id. at 74). Dr. Frey rejected this explanation and informed plaintiff that TriSource would be reporting his drug test as positive to Wolf Creek. (Id.). In this same conversation, plaintiff asserted to Dr. Frey that his drug test should be reported as negative because it fell under the fifteen nanogram threshold. (Id. at 164). Dr. Frey responded, however, that any amount of drugs in the specimen could be reported as positive. (Id.). Dr. Frey also told plaintiff that he assumed plaintiff's second drug test was negative inasmuch as only positive drug screens were forwarded to TriSource. (Id. at 74–75).

Also on March 26, 1993, Steven Boyce, a TriSource employee, spoke with Loren Bush, a Nuclear Regulatory Commission official

working at the Wolf Creek facility. The two discussed how to handle urine specimens that are suspected of having been adulterated or diluted to prevent the detection of illegal drugs. Plaintiff implicitly alleges that the Boyce–Bush conversation alluded to his drug screen.

That same day, Dr. Christopher Kafka, another TriSource employee and MRO, phoned Wolf Creek and notified Jayne Barnhart Pearson that one of plaintiff's urine samples had tested positive for marijuana. Wolf Creek then revoked plaintiff's unescorted access to the facility. Four days later, Dr. Kafka followed up his telephone conversation with Pearson by sending a written report of plaintiff's drug screen to Wolf Creek.

During the first week of April 1993, plaintiff phoned an official at the Nuclear Regulatory Commission and complained that Wolf Creek had violated its testing procedures by reporting negative test results as positive. (Pl.'s Resp. to TriSource's Mot. for Summ. J., Rigby Depo. at 83–84). On April 6, 1993, plaintiff's counsel submitted a formal complaint to the Commission echoing the grievances that plaintiff had lodged over the phone earlier that week. Plaintiff maintains that the Commission never responded to his request for an investigation.

On April 28, 1993, plaintiff appealed the revocation of his unescorted access to Wolf Creek on the ground that "the proper procedures for conducting [his] urinalysis were not followed." (TriSource's Mot. for Summ. J., Ex. H). Approximately three weeks earlier, plaintiff's attorney had requested a copy of the drug testing procedures, the "pass-fail limits for marijuana nanograms," and the specific results of plaintiff's test. (Id., Ex. K). On May 6, 1993, Wolf Creek's Quality Assurance Manager contacted plaintiff and informed him that, after careful review, the denial of access decision had been affirmed. (Id., Ex. I). On May 13, 1993, plaintiff's attorney wrote to Wolf Creek's human resources manager and indicated that plaintiff would be appealing the Quality Assurance Manager's decision.[3] This appeal was denied

---

3. The record does not indicate to whom this final appeal was taken. It appears, however, that a Wolf Creek official made the decision to deny the appeal after consulting with various doctors, at least one of whom was not a Wolf Creek employee. (See TriSource's Mot. for Summ. J., Ex. M).

at an unspecified date thereafter, thereby exhausting plaintiff's administrative appeals. (Pl.'s Resp. to TriSource's Mot. for Summ. J., Rigby Depo. at 156).

In September 1995, plaintiff filed a lawsuit in this court against Wolf Creek. In that action, plaintiff alleged, *inter alia*, that both of his urine specimens had registered levels of marijuana below the minimum cut-off levels. (TriSource's Mot. for Summ. J., Ex. E at ¶¶ 21–23). He further averred that the confirmation of a positive drug screen based on his test results amounted to negligence and effectively terminated his employment in the nuclear industry. (*Id.* at ¶¶ 27–31). Plaintiff dismissed that case in October 1996 with prejudice.

On March 14, 1997, plaintiff filed the instant suit against Clinical. After securing leave of court, plaintiff amended his complaint on May 27, 1997 and added TriSource as an additional defendant.

## II. Summary Judgment Standards

In deciding a motion for summary judgment, the court must examine any evidence tending to show triable issues in the light most favorable to the nonmoving party. *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir. 1984). A moving party is entitled to summary judgment only if the evidence indicates "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine factual issue is one that "can reasonably be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by "showing" that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has prop-

erly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*

## III. Discussion

Plaintiff asserts seven claims in this action: breach of fiduciary duty, tortious interference with contract or prospective contracts, fraud, conspiracy, negligence per se, invasion of privacy, and breach of contract. Defendants argue that all of the tort claims are barred by the applicable statute of limitations.[4] Defendants further contend that the breach of contract claim has no merit because plaintiff was not an intended third-party beneficiary of the contracts between defendants and Wolf Creek.

### A. Choice of Law

Before addressing the validity of defendants' arguments, the court must determine what state's substantive law governs plaintiff's claims. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (in diversity actions, federal court must apply the substantive law of the forum state). In making this determination, the court first applies the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Kansas adheres to a *lex loci delicti* approach, meaning that the law of the "place of the wrong" controls. *Ling v. Jan's Liquors*, 237 Kan. 629, 703 P.2d 731, 735 (1985). The "place of the wrong" is the location in which the last event necessary to impose liability occurred. *Id.*

---

4. TriSource argues that plaintiff's fraud claim also fails inasmuch as plaintiff did not rely upon any misrepresentations by TriSource. The court agrees that, having immediately rejected the accuracy of his drug screen reports, plaintiff cannot demonstrate any reliance upon defendants' alleged misrepresentations. *See Slaymaker v. Westgate State Bank*, 241 Kan. 525, 739 P.2d 444, 451–52 (1987). Because the court finds that the statute of limitations bars all of plaintiff's tort claims, however, the reliance issue need not be addressed in detail.

■ Neither side addresses the choice-of-law issue. Defendants merely assume in their pleadings that Kansas law is applicable. Plaintiff, although noting that Clinical is a Kansas corporation and that TriSource is a Missouri corporation with its principal office in Missouri, also assumes that Kansas law governs this case. In *Ling*, the Kansas Supreme Court held that in an action seeking "damages for injuries sustained in Kansas which were the result of a negligent act in another state, the liability of the defendant is to be determined by the laws of this state." *Id.* 703 P.2d at 735. The supreme court made clear in *Volt Delta Resources, Inc. v. Devine*, 241 Kan. 775, 740 P.2d 1089, 1092–93 (1987), that the *Ling* holding extends to all tortious conduct, both intentional and otherwise. With respect to contractual-based claims, *lex loci contractus* is the governing theory meaning that the law of the state in which the contract was made controls the interpretation of the contract. *Safeco Ins. Co. v. Allen*, 262 Kan. 811, 941 P.2d 1365, 1372 (1997).

All relevant conduct in this case transpired within Kansas borders. Wolf Creek and Clinical are both located in this forum and conduct all business here. Although TriSource performed its medical review analysis from its Missouri office, it notified plaintiff of its findings at his Kansas apartment and directed its conclusions to Wolf Creek's Kansas facility. Under these facts, the court concludes that plaintiff sustained all injuries while working and residing in this state. Moreover, the contracts between defendants and Wolf Creek appear to have been made in Kansas. Accordingly, Kansas law controls this action.

### B. Statute of Limitations on Plaintiff's Tort Claims

■ The parties agree that plaintiff's tort claims are governed by the two-year statute of limitations set forth in K.S.A. 60–513(a)(3) & (4). The dispute here revolves around the accrual date of those claims. The Kansas legislature has adopted a discovery rule for use in calculating the accrual date of certain tort claims. *See* K.S.A. 60–513(b). Under that provision, the causes of action described in K.S.A. 60–513(a):

shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party . . . .

K.S.A. 60–513(b). The use of the term "substantial injury" in this statute is not intended to suggest that a plaintiff must have knowledge of the full extent of his injuries before the statute of limitations commences. *Roe v. Diefendorf*, 236 Kan. 218, 689 P.2d 855, 859 (1984). A plaintiff simply "must have sufficient ascertainable injury to justify an action for recovery of the damages." *Id.* The extent of the injury is irrelevant. *Id.*

■ In assessing the onset date of plaintiff's ascertainable injury, the court must invoke an objective standard based on an examination of all the surrounding circumstances. *Davidson v. Denning*, 259 Kan. 659, 914 P.2d 936, 943 (1996). If the evidence is in dispute as to the date when plaintiff's substantial injury first appeared or became reasonably ascertainable, the issue should be submitted to the jury for determination. *Gilger v. Lee Constr., Inc.*, 249 Kan. 307, 820 P.2d 390, 394 (1991) (citing *Hecht v. First Nat'l Bank & Trust Co.*, 208 Kan. 84, 490 P.2d 649, 656 (1971)). If, however, the record contains no genuine issue regarding the onset date of plaintiff's injury, summary judgment is appropriate. *Id.*

■ Parsing through plaintiff's rhetoric, the court discerns three theories in opposition to defendant's statute of limitations argument. The court will consider each in turn.

#### 1. Loss of Career

Plaintiff first contends that his substantial injury was the loss of his career, not merely the loss of his temporary job at Wolf Creek. He maintains that he became aware of his unemployability in the nuclear industry only after unsuccessfully attempting to secure positions at other nuclear facilities throughout the United States in the years following his March 1993 drug screen. In attempting to

broaden his injury, and simultaneously extend the statute of limitations, plaintiff essentially avers that he did not realize the true extent of his injuries until years after the defendants' tortious acts. The statute of limitations, however, is triggered the moment plaintiff discovers the fact and causation of his injuries, regardless of their extent. *Roe,* 689 P.2d at 859. At the time Wolf Creek officials denied plaintiff's unescorted access to the plant in March 1993, he knew that he had sustained a substantial injury. Moreover, having been subjected to numerous drug tests during his career in the nuclear industry, plaintiff should have recognized that the revocation of unescorted access privileges at one plant would have a significantly negative effect on his future potential employment in the field.

Plaintiff seeks to avoid the time bar on his claims by raising a continuing violation doctrine, averring that the continued presence of his positive drug screen report precluded him from returning to the nuclear industry. The court recently rejected a similar argument in *United Cities Gas Co. v. Brock Exploration Co.,* 984 F.Supp. 1379, 1388–89 (D.Kan.1997). In refusing to adopt the holding of *Manildra Milling Corp. v. Ogilvie Mills, Inc.,* 723 F.Supp. 567 (D.Kan.1989), the case upon which plaintiff relies here in support of his theory, the court noted that "the continuing violation doctrine has been applied very infrequently outside the Title VII employment discrimination context. The limited areas in which courts have broadened the doctrine's application have involved explicit statutory language, unequivocal legislative intent, or contractual arrangements." *United Cities Gas Co.,* 984 F.Supp. at 1388 (internal citations and footnote omitted). None of those scenarios are presented here.

Plaintiff also cites *Whittenburg v. L.J. Holding Co.,* 830 F.Supp. 557 (D.Kan.1993) to bolster his continuing violation theory. That case, however, is of scant support to plaintiff. In *Whittenburg,* several purchasers of business jets sued the jet manufacturer for fraudulent and negligent misrepresentation. At the time of negotiations, the manufacturer allegedly had misrepresented the number of jets available for delivery. *Id.* at 560–61. Relying on those representations, the purchasers agreed to a price far in excess of the jets' true market value. *Id.* at 561. After the purchasers filed suit, the manufacturer invoked the two-year statute of limitations for such claims, contending that the actual number of jets available for delivery was known to the purchasers more than two years before the commencement of the lawsuit. *Id.* at 561–62. The court, in rejecting the manufacturer's argument, held that "[a] cause of action does not accrue for purposes of the limitation period until the right to maintain a legal action arises; i.e., when the plaintiff could first have filed and prosecuted the action to a successful conclusion." *Id.* at 562 (citing *Pizel v. Zuspann,* 247 Kan. 54, 795 P.2d 42, 56, *modified on other grounds,* 247 Kan. 699, 803 P.2d 205 (1990)).

*Whittenburg* is readily distinguishable from the case at bar. The statute of limitations dispute in *Whittenburg* arose in the context of a constitutional standing issue. The court noted that the purchasers had incurred no substantial injury (thereby implicating no justiciable case or controversy) prior or to tendering the balance of the purchase price for the planes. The court then held that although the plaintiffs should have discovered the fraud several months before taking delivery, their injuries did not arise until final delivery and payment. *Id.* at 562–63. In the instant action, plaintiff suffered legally cognizable injuries the moment defendants informed him that they would be reporting his drug screens as positive to Wolf Creek officials. The fact that plaintiff did not grasp the scope of this injury until several years later is irrelevant to the statute of limitations accrual inquiry. In sum, the court finds that any injury associated with plaintiff's employability in the nuclear field accrued more than two years prior to his initiation of this lawsuit and that the statute of limitations is not extendable by an equitable tolling theory.

### 2. Identity of Tortfeasor

Plaintiff next argues that he did not learn of defendants' alleged "subversion" of the testing and reporting processes until after he conducted discovery in the Wolf Creek litigation. This contention, however, is not supported by the evidence. Plaintiff knew at the time he provided his urine specimens on

March 16, 1993, that all testing would be conducted by Clinical and that all results would be transmitted to an MRO. Ten days later, upon receiving a telephone call from Dr. Frey, plaintiff learned that the MRO services were being performed by TriSource. Accordingly, there is no dispute that, in March 1993, plaintiff knew the identity of all entities playing a role in the collection, testing, and dissemination of his drug screen.

Furthermore, when Dr. Frey contacted him on March 26, 1993, plaintiff became aware that TriSource would be reporting one of his drug screens as positive despite its registering below the normal fifteen nanogram/milliliter cut-off level. Plaintiff questioned the validity of this procedure immediately. He also learned that a second urine specimen he gave on March 16, 1993, was "supposedly" negative, a fact consistent with his steadfast adherence to the argument that he had used no illegal drugs in the recent past. Armed with this information, plaintiff had an obligation to investigate and present his claims in a prompt fashion. Although he may not have been aware of the full extent of defendants' alleged misconduct, plaintiff reasonably should have known that he had sustained a substantial injury at their hands.

Plaintiff claims that, prior to the Wolf Creek litigation, he could not have discovered the defendants' allegedly manipulated paperwork or conspiracy to report his drug tests outside of normal parameters. These procedural irregularities, however, represent neither the source of plaintiff's injuries nor the factor allowing him to ascertain the cause of his injuries; they merely constitute the means by which defendants carried out the alleged misconduct. Plaintiff's underlying injury—the reporting of an apparently negative drug screen as positive—was known to him in March 1993.

Plaintiff avers that actual knowledge—not mere suspicion of a wrong—is required to trigger the running of the statute of limitations. The court disagrees. As the Tenth Circuit recently remarked in a products liability lawsuit,

> Benne fails to recognize that no plaintiff ever knows prior to her suit whether the defendant is negligent. Whether a defendant is negligent is a matter to be resolved by a jury. Until this legal determination is made, a plaintiff can only allege negligence on the defendant's part. The Kansas law does not give plaintiff an infinite amount of time, after learning the cause of her injuries, to ponder whether the equipment injured her because of defendant's negligence or because of other reasons. The plaintiff must take the initiative within the limitations period to set out to prove defendant's negligence. Otherwise, claims would survive for such extensive periods of time that the statute of limitations could be completely eviscerated.

*Benne v. International Bus. Machs. Corp.,* 87 F.3d 419, 427 (10th Cir.1996). Citing *Gilger v. Lee Constr., Inc.,* 249 Kan. 307, 820 P.2d 390 (1991), and *Hecht v. First Nat'l Bank & Trust Co.,* 208 Kan. 84, 490 P.2d 649 (1971), the Tenth Circuit observed that the Kansas discovery rule extends the statute of limitations only for plaintiffs suffering from "latent or difficult to diagnose" injuries. *Benne,* 87 F.3d at 427. In the case at bar, plaintiff's injuries were immediately evident upon his notification of his test results. Although an identification of the full scope of the injuries may have necessitated additional investigation, nothing about those injuries warranted an extension of the statute of limitations. *See Friends Univ. v. W.R. Grace & Co.,* 227 Kan. 559, 608 P.2d 936, 941 (1980) (homeowners who failed to discover that leaking roof was caused by defendant's negligent bonding of roofing material for more than two years after leaking began had no right to toll the statute of limitations "where it was clearly apparent there was a severe problem with the roof caused by defective design, materials, or workmanship").

The court in *Brown v. City of Pompano Beach,* 969 F.Supp. 1317 (S.D.Fla.1997) faced a situation nearly identical to the one presented in the instant action. In that case, a police officer submitted to a random drug test pursuant to the terms of his department's collective bargaining agreement. The test came back positive for drug use. More than a year later, the officer allegedly discovered that the integrity and accuracy of the drug screen test had been compromised. Approximately three years after reaching this "discovery," and more than four years

after receiving his drug test results, the officer filed suit pursuant to 42 U.S.C. § 1983.

The defendants then filed a motion to dismiss arguing that the four-year statute of limitations barred the claim. In response, the officer insisted that the limitation period did not commence until he became aware that the drug test had been compromised. The court rejected the officer's theory and dismissed the case. Applying Florida's discovery rule, the essential elements of which parallel its Kansas counterpart, the court held:

> If [the officer] was not using any illegal drugs at the time that he was tested, then he should have known immediately upon receipt of the positive results that something was wrong with the test. In such a situation, "a person with a reasonably prudent regard for his rights" . . . would realize that the result was incorrect and that his rights might have been violated.
>
> The fact[] that [the officer] received definitive proof of the error [more than a year after undergoing the test does] . . . not alter this result.

*Id.* at 1318 (internal citation omitted). The court thus determined that the statute of limitations accrued as soon as the officer received his positive test results, knowing that he had used no illegal substances. *Id.* This court agrees with the *Brown* analysis and concludes that plaintiff's underlying injuries accrued more than two years prior to the filing of this action.

### 3. Improper Contacts Between Defendants

Plaintiff's final argument is that the facts undergirding his breach of fiduciary duty, conspiracy, and fraud claims could not have been ascertained until the discovery period in his Wolf Creek lawsuit. Even if this allegation is true, the statute of limitations would not be extended. Indeed, these claims represent little more than a thinly veiled attempt to redefine his injuries so as to fall within the two-year limitations period. As noted previously, the source of plaintiff's injuries is the defendants' reporting of an apparently negative drug test as positive, an event which plaintiff knew to have been injurious to him as early as March 1993. He suffered no independent injury from the conspiracy, fraud, or breach of fiduciary duty alleged in his complaint. The fact that he did not discover the methods by which defendants perpetuated his March 1993 injuries has no relevance in terms of commencing the statute of limitations.

▉ Plaintiff urges the court to toll the limitations period under the equitable estoppel doctrine on the theory that defendants fraudulently concealed their improper communications with Wolf Creek and issued a false report purporting to have complied with federal regulatory standards in drug testing procedures. Under Kansas law, "[t]o constitute concealment of a cause of action within the general rule tolling the statute of limitations, . . . there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action." *Baker v. Board of Regents,* 991 F.2d 628, 633 (10th Cir.1993) (quoting *Friends University,* 608 P.2d at 941) (alterations in original). Moreover, a party asserting an estoppel argument must demonstrate "some change in position in reliance on the adversary's misleading statement." *Miller v. Foulston, Siefkin, Powers & Eberhardt,* 246 Kan. 450, 790 P.2d 404, 417 (1990) (citation omitted).

There is nothing in the record suggesting that the equitable estoppel doctrine applies here. Defendants took no action to prevent plaintiff's discovery of his injuries. Defendants disclosed to plaintiff in March 1993 the precise nanogram level of marijuana in his urine specimen and conceded that his test had yielded a reading below the regular cutoff range for "positive" drug screens. Plaintiff thus knew immediately after the release of his test results that he had sustained an injury and had a cognizable cause of action.

Defendants' issuance of an allegedly false report purporting to adhere to all federal regulatory standards is similarly unsupportive of plaintiff's equitable estoppel argument. Plaintiff placed no faith in this document. He questioned both the validity of his drug screen results and the procedures in which his urine specimens had been gathered. He even retained an attorney to investigate the testing procedures and to demand that any errors be corrected. Plaintiff never changed his position in reliance on any contact or

communiqué between defendants and Wolf Creek. Accordingly, the court declines to invoke the equitable estoppel doctrine and concludes that plaintiff's tort claims are barred by the statute of limitations.

*C. Breach of Contract Claim*

Plaintiff next claims that defendants breached their contractual obligations to handle, test, and evaluate the body fluids of Wolf Creek employees with the utmost confidentiality. Although plaintiff concedes that he was neither a signatory nor a named party in the contracts between defendants and Wolf Creek, he insists that he was a third-party beneficiary.

An individual may sue for damages flowing from the breach of a contractual obligation, even though he was not a party to the contract and had no knowledge of the contract at the time it was made, if the contracting parties intended him to be a beneficiary of their obligation. *Wolfgang v. Mid–America Motorsports, Inc.,* 111 F.3d 1515, 1524 (10th Cir.1997) (citing *Cornwell v. Jespersen,* 238 Kan. 110, 708 P.2d 515, 520 (1985) and *Keith v. Schiefen–Stockham Ins. Agency, Inc.,* 209 Kan. 537, 498 P.2d 265, 273 (1972)). In determining the contracting parties' intent as to the rights of a purported third-party beneficiary, the court applies the general rules for construction of contracts. *Id.* (citing *Fasse v. Lower Heating & Air Conditioning,* 241 Kan. 387, 736 P.2d 930, 933 (1987) and *Cornwell,* 708 P.2d at 521). If the contractual terms are plain and unambiguous, both the intention of the parties and the meaning of the contract must be determined exclusively from the instrument. *Id.* (citations omitted). If, on the other hand, the contract is ambiguous and requires an examination of outside materials to clarify its intent, the court may consider evidence of the facts and circumstances surrounding the execution of the instrument. *Id.* (citing *Martin v. Edwards,* 219 Kan. 466, 548 P.2d 779, 786 (1976)). "A contract is ambiguous when the words used to express the meaning and intention of the parties are insufficient in the sense the contract may be understood to reach two or more possible meanings." *Id.*

(quoting *Fasse,* 736 P.2d at 933). The existence of a contractual ambiguity is a question of law. *Nunn v. Chemical Waste Management, Inc.,* 856 F.2d 1464, 1467 (10th Cir. 1988) (citations omitted).

Under Kansas law, contracting parties are presumed to act for their own benefit; thus, an intent to benefit a third-party must be clearly expressed in the contract. *Fasse,* 736 P.2d at 932. The third-party, however, need not be the exclusive beneficiary of the promisor's obligations. *Id.* The contract may benefit either or both of the contracting parties as well. *Id.* (citations omitted). Moreover, there is no requirement that the third-party beneficiary be personally named in the contract as long as he is "a member of a designated class or identifiable in some manner as a benefited person." *Hartford Fire Ins. Co. v. Western Fire Ins. Co.,* 226 Kan. 197, 597 P.2d 622, 632 (1979). Pursuant to this analysis, courts may not reach the issue of whether a third-party may directly enforce a contract from which it would benefit until that third-party identifies the existence of a specific contractual provision operating to its benefit. *Id.; see also United States v. United Servs. Auto. Ass'n,* 968 F.2d 1000, 1002 (10th Cir.1992).

Although conceding that he was neither a signatory nor a named beneficiary in the contracts between defendants and Wolf Creek, plaintiff argues that the contracts' specific incorporation of both federal regulations governing drug tests in the nuclear industry as well as Wolf Creek's own drug screen policies evince an intent to benefit employees such as plaintiff. He claims that the agreements are intended to maintain the confidentiality interests of test subjects and protect against the arbitrary forwarding of inaccurate or substandard results that may have a medical explanation other than illegal drug use. In support of his theory, plaintiff points to an array of contractual provisions revolving around the handling of urine specimens, the dissemination of negative test results, the cut-off levels triggering a positive result, and the mandatory consultation with test subjects prior to the issuance of a positive drug screen evaluation.[5] The court does

---

**5.** Wolf Creek's contract with Clinical states that Clinical "shall maintain and use test records with the highest regard for individual privacy."

(Pl.'s Resp. to Clinical's Mot. for Summ. J., Boyce Ex. 14 at ¶ 30). The contract also re-

not believe that these provisions create a *contractual* duty of reasonable care toward plaintiff.

A number of courts have addressed the issue of laboratory liability in the context of mandatory drug testing. Some have held that laboratories owe no duty of reasonable care to the individuals whose specimens they test. *See, e.g., Willis v. Roche Biomedical Labs., Inc.,* 61 F.3d 313, 316 (5th Cir.1995) (applying Texas law) (citing *SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347, 351–54 (Tex.1995)); *Caputo v. Compuchem Labs., Inc.,* No. 92–6123, 1994 WL 100084 (E.D.Pa. Feb.23, 1994) (applying Pennsylvania law), *aff'd* 37 F.3d 1485 (3d Cir.1994) (Table), *cert. denied,* 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995); *Herbert v. Placid Refining Co.,* 564 So.2d 371, 374 (La.Ct.App.), *writ denied,* 569 So.2d 981 (La.1990). Other courts have held that drug-testing laboratories, at least in certain circumstances, do owe a duty of reasonable care to the persons whose specimens they analyze on behalf of employers or prospective employers. *See, e.g., Santiago v. Greyhound Lines, Inc.,* 956 F.Supp. 144, 154 (N.D.N.Y.1997) (applying New York law); *Devine v. Roche Biomedical Labs.,* 659 A.2d 868, 871 n. 2 (Me.1995); *Stinson v. Physicians Immediate Care, Ltd.,* 269 Ill.App.3d 659, 207 Ill.Dec. 96, 646 N.E.2d 930 (1995); *O'Connor v. SmithKline Bio–Science Labs., Inc.,* 36 Mass.App.Ct. 360, 631 N.E.2d 1018, 1020, *review denied,* 418 Mass. 1106, 639 N.E.2d 1082 (1994); *Nehrenz v. Dunn,* 593 So.2d 915, 917 (La.Ct. App.1992); *Irwin v. Wal–Mart Stores, Inc.,* 813 S.W.2d 99, 102 (Mo.Ct.App.1991).

None of the preceding cases offer support to plaintiff's breach of contract claim. In-

deed, every court finding liability on the part of drug-testing laboratories has grounded its holding in a negligence theory.[6] The courts have held universally that test subjects are not third-party beneficiaries of the contracts between employers and laboratories and, therefore, have no cause of action outside of tort law. *See Kennedy v. City of New York,* No. 94–2886, 1996 WL 711505 (S.D.N.Y. Dec. 10, 1996); *Devine,* 659 A.2d at 870–71; *Stinson,* 207 Ill.Dec. 96, 646 N.E.2d at 933; *Elliott v. Laboratory Specialists, Inc.,* 588 So.2d 175, 176 (La.Ct.App.1991), *writ denied,* 592 So.2d 415 (La.1992). Even advocates of expanded laboratory liability concede that a breach of contract claim is an improper vehicle for subjecting the lab to liability. *See, e.g.,* Karen Manfield, Comment, *Imposing Liability on Drug Testing Laboratories for "False Positives:" Getting Around Privity,* 64 U. Chi. L.Rev. 287, 306 (Winter 1997).

In *Devine,* the Maine Supreme Judicial Court confronted an issue strikingly similar to the one presented in the case at bar. 659 A.2d 868. In that action, the plaintiff received a job offer from Bath Iron Works (BIW) contingent on his passing a drug screen. *Id.* at 869. BIW conducted the testing itself and determined that the plaintiff's two urine specimens revealed the presence of opiates. BIW then sent the specimens to Northern Diagnostic Laboratories (NorDx), with whom BIW had contracted to conduct independent drug test confirmations. NorDx, meanwhile, had subcontracted the actual testing services to Roche Biomedical Laboratories. Upon receiving the plaintiff's samples, Roche confirmed BIW's findings and the plaintiff was forced to resign. Short-

quires that both negative drug screens and unconfirmed positive drug screens be reported as negative. (*Id.* at ¶ 11). Positive drug screens under the agreement must register at or above the cut-off levels specified in Appendix A to 10 C.F.R. Part 26. (*Id.* at ¶ 3).

Wolf Creek's contract with TriSource requires TriSource to "establish and permanently maintain a system of files and procedures for the protection of personal information" and prohibits the company from disclosing test results except to a handful of parties. (Pl.'s Resp. to TriSource's Mot. for Summ. J., Scheper Ex. 1 at ¶ 8.1). By incorporating federal regulatory provisions and Wolf Creek's "fitness for duty" requirements into its contract, TriSource further

obligated itself to forward all negative drug test results to Wolf Creek personnel. (*Id.* at ¶ 6.8.2.1.1). TriSource also agreed to afford test subjects whose urine specimens indicated the presence of drugs above specified cut-off levels the "opportunity to discuss the test result ... and explain any medical or legitimate reason" for the result before confirming the drug screen to Wolf Creek. (*Id.* at ¶ 6.8.3.1).

6. The court need not determine whether Kansas would recognize such a tort claim. Even if such a claim was viable under the laws of this state, plaintiff's failure to bring suit within the two-year statute of limitations would preclude any recovery. *See* Part III .B.

ly thereafter, the plaintiff contacted a BIW official and suggested that daily poppy seed consumption may have triggered the positive result. The BIW official called a doctor at Roche and inquired about the validity of this suggestion. After the Roche representative advised that the opiate level in the plaintiff's drug screen could not have been caused by poppy seeds, BIW decided to adhere to its original decision regarding the plaintiff's employment.

The plaintiff then filed a complaint sounding in tort and contract against BIW, Roche, and NorDx.[7] He predicated his contract claim on his alleged third-party beneficiary status in the BIW–NorDx agreement. Citing the Restatement (Second) of Contracts § 302 (1981), the Supreme Judicial Court held that the plaintiff was merely an incidental beneficiary under the contract and, therefore, enjoyed no enforceable rights under the agreement. *Id.* at 870–71. The court noted:

> While the contract acknowledges that BIW is relying on NorDx's special skills, knowledge and ability regarding the type of work to be performed, we read this language neither to expand the work contracted for nor to indicate the intent that the performance of that work benefit BIW employees.
>
> \*  \*  \*  \*  \*  \*
>
> That contract was intended to help BIW implement its Substance Abuse Policy and Procedures. Although that policy appropriately evinces a concern for the well-being of employees who suffer from substance abuse, BIW implemented that policy because, as the policy notes, substance abuse affects "security, safety, quality, control, productivity and employee health," all of which are important to the economic well-being of the company.

This recognition of the reasons for the policy and the related contract with NorDx is important because it underscores why the nature of the contract itself does not imply an intent on the part of BIW to confer an enforceable benefit on an employee like [plaintiff]. BIW is not in the health care business. It engaged in drug testing of [plaintiff] and other employees to advance its economic objectives. Simi-

larly, [plaintiff] did not submit to the drug testing at BIW to address his health concerns. He submitted only because the drug testing was a condition of employment. For both BIW and [plaintiff], the drug testing was incidental to their employment relationship.

*Id.* at 870.

The court finds the *Devine* reasoning persuasive. As in *Devine,* the agreements between defendants and Wolf Creek in this lawsuit merely reflect the terms and conditions between the contracting parties over how drug tests will be conducted. Any benefit that a third-party derives from those contracts is entirely incidental. Further, exposing defendants to contractual liability on the theory that the agreements include terms designed to protect the confidentiality of test subjects and the accuracy of test results would not only thwart the intentions of the contracting parties, but would discourage drug testing laboratories from including such language in their future contracts. In an area as sensitive as drug testing, the omission of such terms could have highly adverse repercussions. In sum, while plaintiff may have had an actionable tort claim in this case had he acted timely in bringing suit, he cannot prevail on any claim sounding in contract. *See generally Isler v. Texas Oil & Gas Corp.,* 749 F.2d 22, 23–24 (10th Cir.1984) (applying Kansas law) (articulating fundamental distinctions between contract law and tort law).

Plaintiff argues that the Tenth Circuit's recent opinion in *Wolfgang* bolsters his breach of contract theory. The court disagrees. In *Wolfgang,* a race car driver crashed into a wall during a practice session at an area speedway and suffered multiple injuries. 111 F.3d at 1520. The driver then brought a personal injury action against a variety of parties including the race promoter (World of Outlaws) and the track owner (Mid–America Motorsports), alleging that the defendants had acted wantonly by failing to provide adequate fire safety and rescue operations. *Id.* The plaintiff predicated the duty element of his negligence claim on a provision in the contract between World of Out-

---

7.  The court dismissed the tort claims for a lack  of evidence. *Devine,* 659 A.2d at 871 n. 2.

laws and Mid–America Motorsports that stated, "Designated World of Outlaws officials shall have the right to cancel any event due to unsafe racing conditions." *Id.* at 1524. He alleged that the provision created an obligation on the part of World of Outlaws to ensure that racing conditions were safe. He further claimed that as a participating driver, he was a third-party beneficiary to the contract. *Id.* After reciting Kansas law on the issue of third-party beneficiaries, the circuit held that plaintiff was an intended beneficiary of the contract between World of Outlaws and Mid–America Motorsports and, therefore, could enforce any obligations arising therein. *Id.* at 1524–25.

This court finds *Wolfgang* distinguishable from the instant action. In *Wolfgang,* the circuit determined that the agreement between World of Outlaws and Mid–America Motorsports could only benefit trackside viewers and drivers such as the plaintiff inasmuch as neither contracting party was on the track during an event. *Id.* at 1524. In contrast, the instruments negotiated between Wolf Creek and defendants are designed to give defendants detailed guidance on how to conduct drug screens and disclose test results. The contracting parties here did not intend to benefit plaintiff by proving to him what he already knows (i.e., that he did or did not use illegal drugs). Nor did plaintiff submit to the drug screen out of a belief that he would be deriving some benefit therefrom; he agreed to be tested only because his employment was contingent upon submission. Wolf Creek and defendants intended only to create a document describing the specific procedures for employee drug testing so as to ensure compliance with all federal regulatory requirements and maintain a safe environment at Wolf Creek's nuclear plant. The fact that a test subject, upon learning of his test results, may be relieved of the burden of "wondering whether he or she had passed ... or whether [the test had been] erroneously reported," (Pl.'s Resp. to Clinical's Mot. for Summ. J. at 71), is a purely incidental consequence of the contracting parties' intentions. Plaintiff is not a third-beneficiary of the contracts between Wolf Creek and defendants and cannot maintain a breach of contract claim against either defendant.

IT IS, THEREFORE, BY THE COURT ORDERED that the motions for summary judgment of defendant TriSource Healthcare, Inc. (Doc. 78) and defendant Clinical Reference Laboratory, Inc. (Doc. 110) are granted.

IT IS FURTHER ORDERED that defendant TriSource Healthcare, Inc.'s motion (Doc. 118) to supplement an exhibit in its motion for summary judgment motion is denied as moot.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**